# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Loren Kiskadden,                          :
                                          : No. 1167 C.D. 2015
                   Petitioner             : Argued:  April 13, 2016
                                          :
             v.                           :
                                          :
Pennsylvania Department of                :
Environmental Protection,                 :
                                          :
                   Respondent             :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY JUDGE WOJCIK                    FILED:  October 26, 2016


Loren Kiskadden (Kiskadden) seeks review of an adjudication of the Pennsylvania Environmental Hearing Board (Board) dismissing his appeal upon determining he did not meet his burden of proving that the natural oil and gas drilling operations conducted by Range Resources-Appalachia, LLC (Range)[1] at the Yeager Site contaminated his well water.  Kiskadden contends substantial evidence does not support the Board's factual findings; the Board capriciously disregarded material competent evidence demonstrating a hydrogeological connection between his well and the natural gas operations at the Yeager Site; and, the Board erred by relying on speculative evidence to support its finding that a

---

[1] Range intervened in this appeal.

hydrogeological connection did not exist. After careful review of the extensive and well-developed record, we affirm.

## I. Background

Kiskadden's residential property is located on Banetown Road in Amwell Township, Washington County, Pennsylvania. Kiskadden and various family members have resided on the property for the last 30 to 40 years. Kiskadden has personally resided there since 2008. Kiskadden's water is supplied by a well located on the property. The depth of the well is believed to be 300-397 feet deep, but the age or details regarding the construction of the well are unknown. The property is located adjacent to a vehicle scrap yard, which his family has run since the 1960s. The property is also located approximately within one half mile, or 2,900 feet, of Range's Yeager Site. The Yeager Site sits on a hilltop to the northeast of the Kiskadden property, which sits in a valley.

In December 2009, Range began conducting oil and gas extraction operations at the Yeager Site. The Yeager Site consists of a centralized impoundment for the storage of gas well related waters, a drill cuttings pit, and a mud processing pit, as well as three unconventional gas wells[2]: 1H, 2H and 7H. Initially, Range operated one unconventional gas well (7H), which it drilled from September to November 2009, and then horizontally drilled and hydraulically fractured in December 2009. Burkett Shale within the Upper Devonian Formation

---

[2] An unconventional gas well taps gas trapped in a deep shale formation, rather than shallower sand formations targeted by conventional gas wells. After drilling vertically to reach the target shale formation, unconventional gas well drilling continues in a horizontal direction. To stimulate gas production, the shale is hydraulically fractured by injecting fluids at high pressure. Reproduced Record (R.R.) at 716a.

is the target formation at a depth of approximately 7,200 feet. Range later added two additional unconventional wells (1H and 2H), which it drilled vertically from December 2010 to January 2011, and then drilled horizontally and hydraulically fractured in 2014. Marcellus Shale is the target formation of the additional wells. Board's Adjudication, 6/12/15, Findings of Fact (F.F.) Nos. 25, 26, 30, 32.

Kiskadden filed a complaint with the Department of Environmental Protection (Department) alleging that, in June 2011, his well water foamed, contained gray sludge-like matter and had a rotten egg odor. The Department conducted an investigation that consisted of inspections of Kiskadden's property and the Yeager Site, water-quality testing and a hydrogeology study of the area. Range also conducted water quality testing of Kiskadden's water.

The tests, conducted on June 6, 2011 (Department) and on June 9 and July 27, 2011 (Range) produced similar results. Specifically, the water quality tests of Kiskadden's water showed: a high pH of 8.4 to 9.1; high total dissolved solids (TDS) between 670-1120 milligrams per liter (mg/l), and high sodium, approximately 300 mg/l. However, the chloride concentration was between 33 and 44 mg/l, or about one-eighth of the sodium level. The Department also detected low levels of methane gas, which it identified through isotopic analysis to be drift gas not natural gas emanating from a gas well, and very low concentrations of several organic compounds: butyl alcohol, chloroform and acetone. The tests also revealed Kiskadden's water was bacteriologically contaminated by high levels of coliform. Ultimately, the Department concluded Kiskadden's water well was polluted. However, the Department determined the contamination in Kiskadden's water supply was not caused by or otherwise impacted by activities at the Yeager

3

Site or any other gas well related activities as neither the hydrogeological study nor analytic results supported a connection. Reproduced Record (R.R.) at 6906a-08a.

From this determination, Kiskadden appealed to the Board. Range intervened. The parties conducted discovery and filed numerous pretrial motions. When Range did not respond to a discovery request to provide a list of all products and the composition of all products used at the Yeager Site, the Board granted "a rebuttable presumption[,] which eliminated [Kiskadden]'s need to prove that chemicals found in his water well were contained in the products used at the Yeager [S]ite." Board's Adjudication at 6. In other words, any chemicals found in Kiskadden's well water were presumed to be present at the Yeager Site. But, this rebuttable presumption did not relieve Kiskadden's burden of proving a hydrogeological connection between his well and the Yeager Site, by a preponderance of the evidence. *See* 25 Pa. Code §1021.122.

The Board exercised *de novo* review, held a 20-day trial and conducted two site views in October 2012 and September 2014. The parties presented extensive testimony and numerous exhibits. Kiskadden testified and presented Paul Rubin, a hydrogeologist, and Dr. Michael Sommer, a forensic geochemist. The Department presented Michael Morgart, a geology and hydrogeology expert, Alan Eichler, an expert on water investigations and isotopic gas evaluations who managed the Department's Oil and Gas Program in the Southwest Region and issued the Department's determination, Vincent Yantko, the Department's field water quality specialist, and John Carson, the Department's water quality specialist, among others. Range's witnesses included Elizabeth Perry, a geology and hydrogeology expert. At the conclusion of the evidence, the parties filed post-hearing briefs.

4

Based on the voluminous record,[3] the Board issued a 55-page order, containing 173 findings of fact, 10 conclusions of law, and a thorough discussion of the issues. The Board found that numerous problems existed at the Yeager Site, including several leaks and spills, during the relevant timeframe from 2010 through 2011. At the time Kiskadden experienced his water issues in June 2011, the Department was unaware of some of these problems. In fact, some of the leaks and spills were never reported to the Department, while others were not reported in a timely or accurate manner. A summary of the leaks and spills at the Yeager Site include, but are not limited to, the following:

| March 2010 | Drill cuttings pit leaked, releasing production fluid into the soil |
|---|---|
| April 2010 | Fluid was placed in the Yeager impoundment before a hole in the double liner system was patched. |
| June 2010 | Ten gallons of drilling mud were spilled onto the ground. |
| July 2010 | A secondary containment overflowed and flowback water[4] was released to the ground. |
| August 2010 | Hydrogen sulfide was detected and treated in the Yeager impoundment. |
| | Approximately 84 gallons of brine water spilled. |
| | A couple hundred gallons of clarified brine spilled from a tank outside of the containment area. |
| | Holes discovered in containment system, which allowed spilled fluids to leak into ground. |
| November 2010 | Testing of the impoundment's leak detection zone revealed that the impoundment was leaking. |
| December 2010 | Secondary containment at the Yeager impoundment overflowed. |
| | Fifteen gallons of diesel fuel spilled in the same area. |

[3] The record consists of a transcript containing approximately 5,000 pages and hundreds of exhibits. There are 19 volumes of reproduced records, consisting of 8,926 pages.

[4] Flowback water is a water-based fracturing fluid that flows back to the surface after the completion of hydraulic fracturing. F.F. No. 29.

| January 2011 | Ten to 15 barrels of blended water[5] were released onto the ground. |
| | A leak occurred on a transfer line that was transferring flowback water between the Yeager Site and another drill site. |
| February 2011 | A truck overturned at the Yeager Site, spilling a load of frac water, diesel fuel and oil. |
| March 2011 | A truck left its valve open and fluid, at least 20 gallons and possibly 100 gallons, spilled onto the ground at the Yeager Site, ran down to the access road and into an open field. |
| June 2011 | A truck again left its valve open and spilled recycled water that was removed from the Yeager impoundment. |

Board's Adjudication at 3-4. The problems at the Yeager Site persisted after Kiskadden filed his complaint,[6] including one instance where, without obtaining Department approval, Range flushed the drill cuttings pit with 30,000 gallons of water. At the time of flushing, the soil contained contaminants above background levels. *Id*. at 4, n.5.

There was no dispute that Kiskadden's water well is polluted. However, the crux of the matter before the Board was whether the operations at the Yeager Site *caused* the pollution in Kiskadden's water well, which is Kiskadden's burden to prove.

---

[5] Blended water consists of flowback, frac water or treated water. Board's Adjudication at 4.

[6] The Department cited Range Resources for numerous violations of state laws regulating oil and gas, solid waste management, clean streams, and dam safety and encroachment related to leaks and spills occurring at the Yeager Site. R.R. at 4079a-4085a. In September 2014, the Department and Range entered a consent order and agreement in which Range agreed to pay $4.15 million in fines for contamination occurring at the Yeager Site and other impoundments and to close several impoundments, including Yeager. The consent order and agreement is available on the Department's portal: *http://files.dep.state.pa.us/RegionalResources/ SWRO/SWROPortalFiles/Range(COA)(Final%20Signed%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).pdf* (last visited 8/22/16).

Acting as fact-finder, the Board weighed the conflicting testimony and evidence. The Board credited the testimony presented by the Department and Range over Kiskadden's experts, Rubin and Dr. Sommer. Specifically, the Board found Rubin's testimony "to be conclusory and difficult to follow." Board's Adjudication at 36. The Board added Rubin spent a great deal of time discussing his work in other cases, rather than answering the questions posed to him in this case. *Id.*

Although the Board found Dr. Sommer's testimony "forthright, credible and well explained," the Board noted that Kiskadden relied on "Dr. Sommer's testimony for conclusions that he did not reach." Board's Adjudication at 41. For instance, Kiskadden, in his post-hearing brief, asserted the gas in his well was "thermogenic." Kiskadden stated "'thermogenic' gas refers to gases that emanate from a petroleum source or as a result of carbon dioxide reduction" and that "the methane in [his] well derives from a thermogenic, deep-seated gas." Board's Adjudication at 41 (quoting Kiskadden's Post-Hearing Brief at 217). None of the experts, including Kiskadden's own expert, Dr. Sommer, testified the gas in Kiskadden's well was thermogenic. Although Dr. Sommer testified the gas detected in Kiskadden's well and the production gas in Range's well were both "deep seated," he testified they were "distinctly different." *Id.*; *see* R.R. at 1091a, 1207a. Dr. Sommer testified the gas in Kiskadden's well was caused by carbon dioxide reduction, whereas Range's production gases emanated from a petroleum source. Board's Adjudication at 41; *see* R.R. at 1207a. Dr. Sommer had no reason to believe the gas in Kiskadden's well had any relationship to the gas in Range's production well. Board's Adjudication at 41; *see* R.R. at 1207a.

In contrast, the Board found the testimony of Range's expert, Perry, to be "clear, concise and easy to follow." Board's Adjudication at 36. "She answered the questions at hand and her theories were well articulated and supported." *Id.* Perry "presented credible testimony that the strata of lower permeability in the vicinity of the Yeager [S]ite would have prevented groundwater from penetrating vertically and would instead cause the groundwater to perch on top and travel horizontally in the direction of the Yeager Springs."[7] *Id.* at 37-38. In addition, the Board relied on the testimony of the Department's witnesses.[8]

Ultimately, the Board determined that Kiskadden did not demonstrate, by a preponderance of the evidence, that a hydrogeological connection existed between his water well and Range's operation at the Yeager Site. The Board found the impermeability of the soil in the area did not allow for movement of chemicals between the Yeager Site and Kiskadden's well water. *See* F.F. Nos. 85, 161, 162, 164. Although Kiskadden produced hundreds of pages of sampling results showing that numerous parameters were detected in both his water well and at the Yeager Site, he did not persuade the Board that a hydrogeological connection existed. The Board found that many of parameters detected were naturally occurring in groundwater and reflective of background water quality in the area. F.F. Nos. 79, 95, 96, 129, 130, 154, 156. Other contaminants detected were not unique to oil and gas well operations. F.F. Nos. 77, 78.

---

[7] Yeager Springs is located northwest from the Yeager Site, whereas Kiskadden's property is located southwest from the Yeager Site. *See* R.R. at 7136a.

[8] Although the Board did not make specific credibility determinations regarding the Department's witnesses, it cited their testimony in support of numerous findings.

More particularly, the Board noted gas well waste fluids are high in many parameters, including sodium, calcium, total dissolved solids, and heavy metals. F.F. No. 97. But, it found such fluids characteristically show the highest concentration in chloride, usually 2-3 times that of sodium. F.F. Nos. 97, 99. Kiskadden's water supply showed a chloride concentration of about one-eighth of the sodium level. F.F. No. 100. Assuming sodium and other contaminants from gas-related waters at the Yeager Site traveled to Kiskadden's well, the Board reasoned chlorides would have been present in much higher concentrations, but they were not. F.F. No. 102. Although some parameters detected in Kiskadden's well are not typically found naturally in groundwater, the Board noted other possible contributors, including a nearby salvage yard, the storage and repair of vehicles on the property, and a lack of well maintenance. F.F. Nos. 16, 77, 78, 82, 83. The Board also found Kiskadden's well showed signs of surface water infiltration. F.F. No. 14. Upon determining Kiskadden did not prove a hydrogeological connection between his well and the Yeager Site, the Board dismissed his appeal. Kiskadden now seeks review of the Board's decision.[9]

## II. Issues

First, Kiskadden contends substantial evidence does not support the Board's factual findings that a hydrogeological connection does not exist between Kiskadden's water well and the natural gas operations occurring at the Yeager Site. He claims a hydrogeological connection was established through the use of the

---

[9] Kiskadden also filed an application to vacate and remand, which this Court denied. *Kiskadden v. Pennsylvania Department of Environmental Protection* (Pa. Cmwlth., No. 1167 2015, order filed December 7, 2015).

"definitive test," which demonstrated the movement of contaminants from the Yeager Site (Point A) to his water well (Point B). Evidence presented shows that the contaminants present in his water well are the same as those at the Yeager Site. According to Kiskadden, this proves his water chemistry is consistent with a profile of water contamination by natural gas operations.

Kiskadden argues the Board placed too much emphasis on the lack of chlorides present in his water well. Although high sodium and high chloride levels are indicators of pollution caused by gas well drilling, Kiskadden maintains they are not the only parameters. In fact, the Department developed "suite codes" or "SACs" in order to highlight the presence of other parameters indicative of oil and gas pollution. Such other parameters include heavy metals and man-made chemicals. Kiskadden proved these other parameters are in his water well and the samples taken from the Yeager Site. He claims that many of the parameters detected in his water, such as the man-made contaminants, are not "naturally occurring." Given the temporal relationship between the leaks and spills at the Yeager Site and the sudden onset of his water well contamination, he argues there can be no denying the existence of a hydrogeological connection between the two. In addition to water chemistry, Kiskadden maintains that substantial evidence demonstrates the movement of contaminants in groundwater through an underground fracture network.

Second, Kiskadden contends the Board capriciously disregarded material competent evidence demonstrating the existence of a hydrogeological connection between his water well and the natural gas operations occurring at the Yeager Site. More particularly, he claims the Board ignored his definitive test theory and the evidence regarding underground fracture network, and it acted in

10

defiance of the presumption that the contaminants found in Kiskadden's well water were present at the Yeager Site.

Finally, he asserts that the Board erred as a matter of law in relying on speculative evidence to support its finding that a hydrogeological connection did not exist between his water well and the natural gas operations occurring at the Yeager Site.

### III. Discussion
### A. Substantial Evidence

We begin by noting that our review is limited to determining whether the Board committed an error of law, violated constitutional rights, or whether substantial evidence supports its findings of fact. 2 Pa. C.S. §704; *Harvilchuck v. Department of Environmental Protection*, 117 A.3d 368, 373 n.4 (Pa. Cmwlth. 2015). Substantial evidence is such "relevant evidence upon which a reasonable mind could base a conclusion." *MKP Enterprises, Inc. v. Underground Storage Tank Indemnification Board*, 39 A.3d 570, 588 (Pa. Cmwlth.), *appeal denied*, 60 A.3d 537 (2012) (quoting *Rohde v. Unemployment Compensation Board of Review*, 28 A.3d 237, 242 (Pa. Cmwlth. 2011)). In determining whether substantial evidence exists, we view the record in the light most favorable to the party that prevailed before the Board, and give that party the benefit of all reasonable inferences that can be drawn from the evidence. *MKP Enterprises*, 39 A.3d at 588; *Herzog v. Department of Environmental Resources*, 645 A.2d 1381, 1387 (Pa. Cmwlth. 1994).

Further, "[q]uestions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are properly within the exclusive discretion of the fact-finding agency, and are not usually matters for a reviewing court."

11

*Herzog*, 645 A.2d at 1387 (quoting *Chapman v. Pennsylvania Board of Probation and Parole*, 484 A.2d 413 (Pa. Cmwlth. 1984)); *accord Brockway Borough Municipal Authority v. Department of Environmental Protection*, 131 A.3d 578, 586-87 (Pa. Cmwlth. 2016). It is irrelevant whether the record contains evidence that would support contrary findings. *Ductmate Industries, Inc. v. Unemployment Compensation Board of Review*, 949 A.2d 338 (Pa. Cmwlth. 2008); *Carbondale Area School District, v. Fell Charter School*, 829 A.2d 400, 404 (Pa. Cmwlth. 2003). Our critical inquiry is whether the findings are supported by substantial evidence. *Ductmate*; *Carbondale.*

In this matter, Kiskadden bore the burden of proving, by a preponderance of evidence, that the Yeager Site was the source of constituents found in his water supply. 25 Pa. Code §1021.122,[10] *see Brockway*, 131 A.3d at

---

[10] This regulation provides:

> (a) In proceedings before the Board, the burden of proceeding and the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue. It shall generally be the burden of the party asserting the affirmative of the issue to establish it by a preponderance of the evidence. In cases where a party has the burden of proof to establish the party's case by a preponderance of the evidence, the Board may nonetheless require the other party to assume the burden of proceeding with the evidence in whole or in part if that party is in possession of facts or should have knowledge of facts relevant to the issue.
> (b) The Department has the burden of proof in the following cases:
>     (1) When it assesses or files a complaint for a civil penalty.
>     (2) When it files a complaint for any other purpose.
>     (3) When it revokes or suspends a license, permit, approval or certification.
>     (4) When it issues an order.
> (c) A party appealing an action of the Department shall have the burden of proof in the following cases:

**(Footnote continued on next page…)**

587.  "A preponderance of the evidence is such proof as leads the trier of fact to find that the existence of a contested fact is more probable than its nonexistence." *Al Hamilton Contracting Co. v. Department of Environmental Resources*, 659 A.2d 31, 39 (Pa. Cmwlth. 1995).  "A preponderance of the evidence standard, the lowest evidentiary standard, is tantamount to 'a more likely than not' inquiry." *Helwig v. Department of Transportation, Bureau of Driver Licensing*, 99 A.3d 153, 158 (Pa. Cmwlth. 2014) (quoting *Carey v. Department of Corrections*, 61 A.3d 367, 374 (Pa. Cmwlth. 2013)).

Where the issues require scientific or specialized knowledge or experience to understand, such as the intricacies of drilling and the science of hydrogeology, expert testimony is required.  *Brockway*, 131 A.3d at 587; *Department of Transportation v. Agricultural Lands Condemnation Approval Board*, 5 A.3d 821, 828-29 (Pa. Cmwlth. 2010).  Notwithstanding, a party may meet its burden of proof with circumstantial evidence if it so preponderates in favor of a conclusion as to outweigh in the mind of the fact-finder any other evidence.  *Al Hamilton*, 659 A.2d at 40.

---

**(continued…)**

(1) When the Department denies a license, permit, approval or certification.

(2) When a party who is not the recipient of an action by the Department protests the action.

(3) When a party to whom a permit approval or certification is issued protests one or more aspects of its issuance or modification.

(4) When a party appeals or objects to a settlement of a matter between the Department and another private party.

25 Pa. Code §1021.122.

13

With these principles in mind, we examine the findings that Kiskadden challenges to determine if they are supported by substantial evidence.

### 1. Hydrogeological Connection – Water Chemistry

First, Kiskadden asserts the Board's finding that a hydrogeological connection does not exist between his water well and the natural gas operations occurring at the Yeager Site is not supported by substantial evidence. Contrary to Kiskadden's assertion, the Board did not find that a hydrogeological connection between his well and Yeager Site "does not exist." Rather, the Board found Kiskadden did not meet his burden of proving the existence of a connection, which is different and determinative.

Kiskadden attempted to establish the existence of a hydrogeological connection through water chemistry by the use of the "definitive test." Under this theory, a connection is established if a contaminant found at Point A (Yeager Site) turns up at Point B (Kiskadden's well).

Kiskadden contends this theory is well supported by the testimony of the Department's witnesses. Morgart and Eichler both testified regarding the definitive test. Specifically, Morgart testified:

> I would think [the definitive test] would be a great way of showing that there was a connection if you had maybe not just one chemical parameter but a whole host of parameters and they showed up in the same – probably not the same concentrations because of the dilution rates that we talked about but also everything that was spilled, let's say, should travel through the same pathway. That would be a great indicator that there was a connection.

R.R. at 631a. While recognizing the concentrations may not be the same between Point A and Point B because of dilution, Morgart emphasized that an examination

14

of "the *ratios would be important* . . . ." R.R. at 632a (emphasis added). He continued, "whether the chemicals . . . or the chemical parameters that were together left [P]oint A and went to [P]oint B *in the same ratios*, then that would indicate that there is a similar – there is a pathway." R.R. at 632a (emphasis added). He explained that "the tests would be quality related" and that not just selective parameters would show up between both points. R.R. at 632a.

Eichler testified different chemicals function as tracers. R.R. at 948a. When asked whether it would be important information if the same chemicals at a leak site were later found in a complainant's water, he testified:

> [I]f you have a contaminant that, you know, is known from a certain source area, comes out another location, especially one type of parameter that isn't naturally occurring or isn't found in that particular environment or sometimes that maybe it is, but the concentrations and the geochemistry have changed such that it has increased or altered in some way, then yes.

R.R. at 948a.

The samplings taken from Kiskadden's well water and the Yeager Site revealed the presence of similar constituents. In addition, the Board extended Kiskadden a rebuttable presumption that the chemicals found in Kiskadden's well water were also present at the Yeager Site. On this basis, Kiskadden maintains he definitively demonstrated a hydrogeological connection linking his well and the Yeager Site.

However, Kiskadden's argument misconstrues or oversimplifies the witnesses' testimony. Neither expert testified that the mere detection of certain constituents would prove a hydrogeological connection. According to both experts, *where the constituents are naturally occurring and not unique or limited to gas well waters*, mere detection is not enough to prove a hydrogeological

15

connection.  *See* R.R. at 632a, 948a.  Absent a unique, distinguishing tracer, a silver bullet so to speak, the experts opined there must be a qualitative analysis of the parameters.  *See* R.R. at 632a, 948a.

Yet, Kiskadden's definitive test theory focuses on mere detection of constituents, and it does not take into consideration the Board's findings that many of the constituents detected between his well water and the Yeager Site are naturally occurring within Southwest Pennsylvania and are not unique or limited to drilling activities.  F.F. Nos. 77-79, 95.  Contrary to Kiskadden's assertions, the testimony elicited does not wholly support his theory or show insufficient support for Board's findings to require reversal.

### 2. Naturally Occurring Constituents

Next, we examine the Board's findings regarding naturally occurring constituents in Pennsylvania's groundwater.  The Board found groundwater may contain minerals, chemicals, biological substances and metals.  F.F. No. 95.  Arsenic, aluminum, antimony, barium, boron, cadmium, chromium, cobalt, copper, iron, lead, magnesium, mercury, manganese, molybdenum, nickel, phosphorous, potassium, selenium, silica, silver, thallium, uranium, vanadium, and zinc all exist naturally in groundwater in Pennsylvania, particularly groundwater in Washington County.  F.F. No. 96.  The Board found Kiskadden's water chemistry type is sodium bicarbonate.  F.F. No. 123.  Elevated sodium, TDS, pH and alkalinity is the natural background condition of much of the groundwater in the area of Kiskadden's water well.  F.F. No. 128.  Methane can be naturally occurring in wells in Washington County and southwestern Pennsylvania, either from coal seams or from biological process involving carbon dioxide reduction.  F.F. No.

16

154. Ethane can be produced by bacteria and can be present in biogenic gas; it can also derive from coal seams. F.F. No. 156. Finally, the Board found the consistency of Kiskadden's water sample results over time indicated the water quality is attributable to natural or background conditions, rather than spills or releases related to oil and gas activities. F.F. No. 22. The Board's findings are well founded.

Perry opined that Kiskadden's water supply is typical of groundwater in Washington County. R.R. at 1762a. In making her determination, Perry relied on National Water Information System (NWIS) and National Uranium Resource Evaluation (NURE) databases. R.R. at 1762a. The NURE database contains samples collected in the 1970s; the NWIS database includes samples collected over many decades, prior to potential impacts from unconventional shale gas development in the region. R.R. at 1763a, 1764a, 1885a.

Based on her research, Perry concluded TDS are a common problem in Washington County. R.R. at 1885a. Perry would expect to see low levels of a variety of metals in any groundwater samples from the county, including arsenic, cadmium, chromium, copper, lead, mercury, selenium, silver and zinc. R.R. at 1885a. As for the inorganic constituents associated with natural gas drilling, namely chloride, sodium, and barium, Perry testified that all of them are naturally occurring in Washington County. R.R. at 1885a; *see* R.R. at 1776a. She testified Kiskadden's water chemistry type is sodium bicarbonate. R.R. at 1761a, 1799a. She explained sodium bicarbonate is common for groundwater in valley settings in the region, since glaciation. F.F. No. 125; R.R. at 1761a, 1844a. She also opined it was common for some chloride to be present in valley groundwater. R.R. at 1765a, 1768a, 1886a, 1887a.

17

Kiskadden challenges Perry's testimony because she did not limit her investigation to the Greene and Washington formations in determining background water quality as a basis for comparison to Kiskadden's water supply. The Board found the Kiskadden well is located in the Washington Formation. F.F. No. 117. The Greene Formation overlies the Washington Formation. F.F. No. 118. The two formations are separated by the Upper Washington Limestone. F.F. No. 118. However, Kiskadden's challenge to Perry's testimony goes to the weight of evidence, not to the sufficiency.

Perry acknowledged Kiskadden's well is located at the bottom of the Greene Formation and taps into the Washington Formation. R.R. at 1846a. She readily admitted that she did not limit her investigation of Washington County water quality results to wells in the Greene and Washington formations. R.R. at 1857a, 1861a-1862a, 1865a. Perry included data from all geologic formations in her research. R.R. at 1862a, 1863a, 1865a. Those other formations were included in the NURE and NWIS databases. R.R. at 1857a, 1869a.

Significantly, she explained water-type signature is not related to geologic formations, but to topographic positions. R.R. at 1771a, 1883a. "[W]ater-type signature is a function of residence time and is independent of geologic formation." R.R. at 1883a. "Residence time" refers to "time that the water has spent in contact with rocks." R.R. at 1761a. She continued: "The different geologic formations are all similar in that they include different layers of similar sorts of rocks, shale, limestone, sandstone. So chemically, the different formations are similar to each other." R.R. at 1883a. She testified her data represented a regional pattern of background groundwater conditions for all of

18

Washington County. R.R. at 1865a, 1868a. Her research included data on wells located in different topographic positions. R.R. at 1844a, 1870a.

Moreover, Eichler reached similar conclusions regarding Kiskadden's water chemistry. Eichler also testified Kiskadden's water type is sodium bicarbonate. R.R. at 729a. He explained bicarbonate is the result of an ion exchange process that raises the pH and alkalinity. R.R. at 729a, 756a. Eichler opined Kiskadden's water profile of TDS, sodium, pH, alkalinity and the absence of chlorides indicate natural softening, not gas-related activities. R.R. at 727a, 729a, 756a. It is "the natural condition of his water." R.R. at 756a.

According to Eichler, naturally soft water is a documented phenomenon in Washington County and Southwestern Pennsylvania, dating back to the 1930s. R.R. at 850a-51a. "[H]igh calcium, the absence of chlorides but high pH and high alkalinity" is typical for the region. R.R. at 729a. The quality of Kiskadden's water well can be explained as a "naturally occurring condition and not as a result of what happened up at the Yeager [S]ite." R.R. at 737a.

In addition, Eichler testified iron and aluminum, even at high levels, are common for the area's soil. R.R. at 801a-802a. Although concentrations of different parameters in the soil would not necessarily be reflected in the same concentrations in the groundwater, he testified Kiskadden's water was heavily contaminated with soil and sediment, which would explain the high levels of iron and aluminum detected. R.R. at 802a. He further testified arsenic, cadmium, chromium, copper, lead, mercury, selenium, silver and zinc at low levels naturally occur in water supplies in Washington County. R.R. at 741a.

Moreover, all of the parties' experts testified the gas in Kiskadden's well derived from carbon dioxide reduction, not from an oil- or gas-related source.

19

Eichler testified the methane in Kiskadden's well water was "biogenic" in nature, not "thermogenic," meaning it did not derive from an oil- or gas-related source. R.R. at 748a, 818a, 1090a. Eichler testified the biogenic source of the methane in Kiskadden's well may be attributable to a coal seam or from biological process involving carbon dioxide reduction. R.R. at 730a. Dr. Sommer opined Kiskadden's methane is "carbon dioxide reduction gas." R.R. at 1181a; *accord* R.R. at 1090a-91a. Dr. Sommer did not testify the methane gas in Kiskadden's well was thermogenic or that it migrated from Range's gas wells. Perry likewise concluded the gas was "biogenic methane derived from carbon dioxide reduction." R.R. at 1798a. Perry testified Range is not the source of biogenic gas because Range would be producing thermogenic gas. R.R. at 1798a.

Finally, both Perry and Dr. Sommer testified ethane may be produced by bacteria and is present in biogenic gas. R.R. at 1158a, 1798a. Eichler testified the ethane detected in Kiskadden's water supply was clearly distinct from the ethane found in Range's gas well samples. R.R. at 748a, 849a.

### 3. Constituents Not Unique to Oil- and Gas-Related Activities

In addition to the naturally occurring constituents, the Board found other constituents detected in Kiskadden's water well were not unique to oil- and gas-related activities. Kiskadden's water well sporadically showed low levels of volatile organic compounds,[11] including acetone, t-butyl alcohol and chloroform. F.F. No. 77. A methyl blue activated substance was also found in his water. F.F. No. 114.

_____

[11] Volatile means the compound evaporates. R.R. at 808a.

Although such constituents are present in drilling fluids, the Board found they are not unique to oil- and gas-related activities. F.F. at 77, 78; Board's Adjudication at 47. The Board further found it was not uncommon to find organic compounds in Kiskadden's water supply based on his proximity to Banetown Road, agricultural operations, adjacent salvage yard, and vehicles on his property. F.F. No. 78. Gasoline from vehicles is a known source of t-butyl alcohol. F.F. No. 83. Acetone is naturally occurring in the environment and is associated with the degradation of organic constituents. F.F. No. 79. Acetone was also detected in a field blank sample,[12] which could be an indication that acetone was a field contaminant. F.F. No. 81. Methyl blue activated substance is soap. F.F. No. 114.

Kiskadden's own experts testified that t-butyl is not unique to drilling. R.R. at 1371a, 1157a. Dr. Sommer conceded t-butyl alcohol may be found in gasoline. R.R. at 1157a. Perry too testified that t-butyl alcohol, which was detected in very low concentrations in Kiskadden's well water, is not unique to natural gas drilling. R.R. at 1792a. She testified anything that has gasoline may be a source of t-butyl alcohol. R.R. at 1793a. She identified road runoff and the presence of abandoned and functional vehicles on Kiskadden's property as potential sources. R.R. at 1793a.

Perry also testified acetone is not unique to natural gas drilling. R.R. at 1792a. Acetone was detected in the blank sampling. R.R. at 1783a. She testified "acetone is likely to be a laboratory contaminant and not actually present in the spring." R.R. at 1783a.

---

[12] "A field blank sample is a sample that is filled with pure water and sent for analysis under the same conditions as the actual sample in order to verify that proper handling procedures are followed and to ensure that no field contaminants are in the sample." F.F. No. 80.

In addition, Dr. Sommer conceded chloroform may be caused by adding bleach to the well. R.R. at 1096a. The Department routinely recommends that homeowners disinfect their wells with diluted Clorox or bleach. F.F. No. 82; R.R. at 53a, *see* R.R. at 609a. At the direction of the Department, in June or July 2011, Kiskadden began pouring bleach into his well water in order to kill bacteria. F.F. No. 82; R.R. at 914a-15a. Kiskadden admitted he did not dilute the bleach as directed. F.F. No. 82; R.R. at 915a.

Carson testified that the methyl blue activated substance is soap. R.R. at 479a. It is sometimes used in drilling to make water wetter, chemically, by breaking down the surface tension. R.R. at 479a. Notwithstanding, Eichler testified methyl blue activating substances are not unique to oil and gas activities, but attributable to detergents and agricultural activities. R.R. at 803a. Methyl blue activating substances have been detected in other groundwater samplings, with no relationship to oil and gas activities. R.R. at 803a-04a.

Eichler further opined that the heavy metal constituents detected in Kiskadden's well are common and not unique to gas well waters. R.R. at 727a. Eichler testified the vicinity of Kiskadden's well is not pristine. R.R. at 729a. There is a road, salvage yard, and agricultural activity nearby. R.R. at 730a. Kiskadden stores boats, vehicles, and other items on his property. R.R. at 730a.

In addition, Yantko testified specific conductance,[13] alkalinity, barium, iron, magnesium, strontium, chlorides, sodium, are not unique to gas-

---

[13] Yantko testified specific conductance is not a parameter, but a measurement of "resistance ... through the water." R.R. at 214a. A pristine stream would generate a low number, whereas something impacted from mine drainage can be in the thousands. R.R. at 214a.

22

related waters.  R.R. at 214a-16a, 238a.  Yantko commonly sees these constituents in background water quality analyses for private water supplies.  R.R. at 214a-16a.

### 4. Concentration, Ratios and Absence of Chlorides

Given the fact that the constituents detected in both Kiskadden's water well and the Yeager Site were either naturally occurring or not unique to gas well waters, their mere detection was insufficient, standing alone, to prove a hydrogeologic connection.  As a result, the Board focused on concentrations and ratios of those very parameters to determine whether a connection existed.  As discussed above, the Department's witnesses testified that ratios and concentrations are important considerations to determining the existence of a connection.  R.R. at 632a, 948a.

However, the Board found that the concentrations and ratios of pollutants found in Kiskadden's water well were not typical of water impacted by gas well related activity.  F.F. No. 101.  Gas well related waters typically exhibit elevated chlorides, sodium, calcium concentrations, high TDS and heavy metals.  F.F. No. 97.  In gas well related waters, concentrations of chloride typically exceed sodium by two to three times.  F.F. No. 99.  However, the chlorides in Kiskadden's water were significantly lower than the level of sodium.  F.F. No. 100.  If sodium levels in Kiskadden's water were attributable to impacts from oil and gas-related fluids, one would expect to see chloride levels 10 to 20 times higher.  F.F. No. 102.  The Board also found the strontium ratio for Kiskadden's water fell outside the range for water from the gas producing formations at issue in this case – Marcellus Shale and Burkett Shale.  F.F. No. 159.  Kiskadden's strontium ratio fell within the

23

established range for water in the Pittsburgh coal seam. F.F. No. 160. These findings are supported by expert testimony and test results.

Perry credibly testified useful indicators for oil and gas impacts on groundwater are the dissolved salts, particularly chloride, as well as sodium, calcium, barium and strontium, as well as volatile organic compounds. R.R. at 1761a. But, she opined, it is unlikely to see organics "without also seeing chlorides at certain concentrations." R.R. at 1761a. She explained, "the salts and particularly the chloride are more likely to reach groundwater and migrate with groundwater at *higher concentrations* than the organics." R.R. at 1761a (emphasis added). Because chloride is "a negatively charged ion, it interacts less with the soil." R.R. at 1841a; *see* R.R. at 1776a. In contrast, sodium interacts with the soil and is absorbed into the soil structure. R.R. at 1776a, 1841a. Perry opined sodium in oil and gas fluids stays with impacted soils after the release, whereas chloride is more mobile and would travel. R.R. at 1776a, 1841a. Although Kiskadden's water was high in sodium, Perry opined the low concentrations of chloride found in Kiskadden's water did not indicate an impact from oil and gas operations. R.R. at 1765a, 1768a, 1886a, 1887a. She concluded the concentrations of contaminants found in Kiskadden's water were within the range in Washington County. R.R. at 1767a, 1889a.

Rubin conceded sodium tends to remain in the soil, while the chlorides will migrate through the groundwater. R.R. at 1366a. Rubin also acknowledged Kiskadden's strontium level fell within the established range for waters from the Pittsburgh Coal Seam. R.R. at 1361a-62a.

Yantko testified, based on studies involving random samplings of flowback and frac fluids, "chloride, sodium, conductivity, TDS were excellent

tracers to look for in water pollution incidents." R.R. at 46a. He opined chlorides are the most concentrated constituent in gas-related fluids. R.R. at 46a.

In addition, Morgart testified the Yeager Site leaked brine water, which is made of sodium chloride. R.R. at 657a. According to Morgart, chlorine is "the parameter that is in by far the highest concentration in all of these waste fluids." R.R. at 736a. He explained chlorides are very mobile. R.R. at 654a. "If there is a release from the impoundment, the chlorides are going to move with it." R.R. at 654a. Thus, if Kiskadden's well water was impacted by what was released at the Yeager Site, Morgart expected to see higher concentrations of chlorides. R.R. at 654a. Morgart opined that he did not see the expected profile of contaminants in Kiskadden's water well. R.R. at 736a. Although there was a rise in TDS, there was not an increase in chlorides. R.R. at 736a.

Furthermore, Eichler testified that gas-related waters contain not just chloride, sodium, and calcium, but a plethora of metallic and nonmetallic constituents in high concentrations. R.R. at 727a. However, he explained these other constituents can be found naturally in groundwater, in "much, much lower" concentrations. R.R. at 727a. When the concentration levels are low, it becomes "impossible to distinguish that value as groundwater versus an impact from . . . a gas well drilling operation or fracking operation." R.R. at 727a. According to Eichler, when the constituents, even in the waste water fluids themselves, are in such low concentrations and are naturally occurring, it is extremely difficult to conclude it came from the gas well site as opposed to just a background level. R.R. at 824a.

Eichler addressed not just the specific constituents in Kiskadden's water, but the concentrations of those constituents. He explained chloride and

25

sodium were dominant constituents leaked at the Yeager Site. R.R. at 823a, 824a, 826a, 827a-828a. Eichler testified, had Kiskadden's well been contaminated by gas-related waters, he expected to see "a chloride value 10, 20 times higher." R.R. at 727a; *accord* R.R. at 823a, 824a. However, higher levels of chlorides were not detected in Kiskadden's water supply. R.R. at 824a.

Indeed, the test results showed Kiskadden's contaminant levels in his water supply remained relatively the same.[14] *See* R.R. at 4586a-4605a, 4673a-4706a, 4865a-4911a, 4912a-4960a, 4961a-4976a. Significantly, Kiskadden's chloride levels remained steady at low levels, while his sodium levels were consistently high:

| Test Date | Chloride | Sodium | Record Location |
| --- | --- | --- | --- |
| 6/6/2011 | 44.3 mg/l | 297 mg/l | R.R. at 4587a, 4597a |
| 6/9/2011 | 33.8 mg/l | 305 mg/l | R.R. at 4865a |
| 7/27/2011 | 39.2 mg/l | 285 mg/l | R.R. at 4932a, 4933a |
| 1/26/2012 | 41.6 mg/l | 163 mg/l | R.R. at 4675a, 4681a, 4682a |
| 3/27/2012 | 41.2 mg/l | 265 mg/l | R.R. at 4962a, 4970a |

The quality of Kiskadden's water supply consistently showed the same profile throughout testing: "high TDS, high sodium, low chlorides, calcium and high pH and alkalinity." R.R. at 729a. In contrast, Yeager Springs demonstrated a pattern for contamination caused by the Yeager Site.

---

[14] The Board noted the parties did not introduce any water samplings more recent than March 2012. Board's Adjudication at 47.

26

## 5. Yeager Springs

Indeed, the Board found Yeager Springs served as a case study for contamination from the Yeager Site. F.F. No. 43; R.R. at 1846a; *see* R.R. at 802a. Yeager Springs are two springs situated northwest, approximately 600 feet away from the Yeager Site. F.F. No. 37. Yeager Springs were contaminated as a result of a March 2010 leak from the drill cuttings pit. F.F. 38; R.R. at 29a, 49a, 804a, 851a-52a, 1680a, 1778a. The Board found the manner in which they were impacted by contamination from Range's operation was instructive in determining whether Kiskadden's water supply was also impacted. F.F. No. 165.

Yeager Springs had pre-drill and post-drill information. R.R. at 802a, 1846a. The experts agreed that a comparison of pre-drill water quality information to post-drill results would provide direct evidence of any changes caused by oil and gas related contamination. R.R. at 1845a. They compared pre-drill and post-drill information for Yeager Springs as an "indicator of what one would expect from oil and gas impacts on groundwater." R.R. at 1846a.

Comparing Yeager Springs' pre-drill and post-drill information, Yantko and Eichler testified Yeager Springs was contaminated based on elevations of three main parameters: chloride, sodium and TDS. R.R. at 49a, 804a, 829a. Yeager Springs exhibited a pronounced increase in TDS and chlorides after contamination. R.R. at 235a, 735a, 736a, 804a, 829a. Eichler testified Yeager Springs served as a "window . . . in the groundwater" after contamination. R.R. at 804a.

However, Eichler testified Yeager Springs is not an "allegory" for Kiskadden's well. R.R. at 736a. Although high levels of TDS and sodium were detected in Kiskadden's well water, high levels of chlorides were not. R.R. at

27

736a, 818a.  Eichler could not identify any way in which sodium would be transported with the groundwater, but not the chloride that was also in the flowback water or the fracturing fluids at the Yeager Site.  R.R. at 851a.  He opined the high levels of TDS and sodium found in Kiskadden's water were naturally occurring.  R.R. at 824a.  He concluded Kiskadden's water did not show characteristics of gas well contamination.  R.R. at 824a.

Perry also relied upon the contaminated Yeager Springs as a basis for comparison to Kiskadden's well.  She looked at Yeager Springs because it provided an actual situation where groundwater was contaminated after a release from the Yeager Site.  R.R. at 1778a, 1890a.  She testified: "Yeager Springs indicated what parameters from the Yeager [S]ite migrated in the groundwater system.  So that's how I used the data from Yeager Springs."  R.R. at 1846a.

Perry testified the primary indicators of contamination at Yeager Springs were chloride, sodium, strontium, barium, calcium and TDS, with chloride being the highest.  R.R. at 1778a-79a, 1784a.  The pre- and post-drill samplings showed dramatic increases in the concentrations of these constituents:

|  | Yeager Springs One | | Yeager Springs Two | |
|---|---|---|---|---|
|  | 8/11/2009 Pre-drill | 12/22/2010 Post-drill | 12/22/2010 Post-drill | 12/22/2010 Post-drill |
| Chloride | 3.7 mg/l | 981.2 mg/l | 2.5 mg/l | 459.6 mg/l |
| Sodium | 6.602 mg/l | 58.1 mg/l | 4.176 mg/l | 23.1 mg/l |
| Strontium | .304 mg/l | 1.13 mg/l | .232 mg/l | .750 mg/l |
| Barium | .071 mg/l | .374 mg/l | .046 mg/l | .194 mg/l |
| Calcium | 98.973 mg/l | 448 mg/l | 108.507 mg/l | 287 mg/l |
| TDS | 301 mg/l | 1720 mg/l | 323 mg/l | 1110 mg/l |

R.R. at 3950a, 4465a; *see* R.R. at 1779a; *see* F.F. Nos. 39-41. Based on this data, Perry determined Yeager Springs were impacted by oil and gas operations. R.R. at 1779a.

Perry expected to see similar parameters in Kiskadden's well water if it too was impacted by oil and gas operations. Although similar constituents were detected, the ratios and concentrations were not similar. R.R. at 1799a. Instead, she opined the concentrations contained in Kiskadden's water supply were reflective of background water for Washington County. R.R. at 1765a, 1768a, 1886a, 1887a.

Notwithstanding, Kiskadden maintains his post-drill water chemistry mirrors that of Yeager Springs. Petitioner's Brief at 53. He claims that the Board erred by not using the pre-drill data for Yeager Springs as a pre-drill baseline for his well.

Unfortunately, Kiskadden did not have his water tested before Range began drilling. R.R. at 34a. Consequently, there was no pre-drill baseline information for his well. F.F. No. 119; R.R. at 34a; 310a, 802a, 1076a. The Board found that hillside springs, such as Yeager Springs, are not a good comparison of background water quality for wells in valley settings, like Kiskadden's, because they have different water signature types due to different resident times, i.e., the amount of time the water has spent in contact with rocks. F.F. No. 131. Because the water chemistry is different, pre-drill samples for the Yeager Springs do not serve as accurate indicators of the pre-drill water quality of Kiskadden's well. F.F. No. 136.

Indeed, although Perry testified Yeager Springs provided an indicator of what parameters to expect after oil and gas well contamination, she explained

the pre-drill data for Yeager Springs would not be representative of Kiskadden's pre-drill well water because they have different water-type signatures. R.R. at 1774a. Instead, Perry relied on "regional patterns as an understanding of what would be expected" in Kiskadden's water well as a baseline. R.R. at 1845a.

Perry explained that "water-type signature is associated with the residence time in the groundwater system." R.R. at 1844a. "[Water] originates as rainwater with very little contact with rocks. And as it moves through the groundwater flow system, as time passes, there is more interaction with rocks. It tends to pick up more minerals." R.R. at 1761a.

Perry testified water-type signature is related to topographic position. R.R. at 1771a. Yeager Springs, which sits on a hilltop, has a different water-type signature than Kiskadden's well water, which sits in a valley. R.R. at 1771a, 1890a. Both Perry and Eichler testified hilltop water is typically characterized as calcium bicarbonate, whereas valley water is characterized as sodium bicarbonate. R.R. at 755a, 1761a, 1771a, 1773a.

Perry testified general patterns of water types in different topographic positions and different ages of groundwater provide an appropriate frame of reference. R.R. at 1845a. According to Perry, in most instances, ground water on hilltops and hillsides tend to be younger than groundwater in valleys. R.R. at 1844a. Perry classified hilltop spring water as "young" water, meaning near its recharge area at the top of the hill. R.R. at 1890a. In contrast, she described Kiskadden's water supply as "very old water," i.e., it has spent more time in the groundwater system, with more interaction with rocks. R.R. at 1844a-1845a, *see* R.R. at 1861a. Perry testified concentration levels for contaminants, like chloride, in "near surface water" or "young water" would be much lower than it is in deeper

30

water wells. R.R. at 1681a. The low chloride levels detected in Yeager Springs One and Two prior to drilling were consistent with young water, whereas the increased elevations in the post-drill samplings were indicative of gas-related contamination. R.R. at 1890a. Yet, Kiskadden's chloride levels, which were between 33.8 mg/l to 44.3 mg/l, were well below what was detected at Yeager Springs after contamination, which were between 459.6 mg/l and 981.2 mg/l.

## 6. Neighboring Wells and Springs

The water quality of other neighboring springs and wells also refuted a hydrogeological connection between the Yeager Site and Kiskadden's well. As Perry testified, "chemistry in the groundwater provides information about groundwater migration directions." R.R. at 1789a. If there was a southwest flow, Morgart testified, any release of the impoundment into the groundwater would go through the springs and wells located in between the Yeager Site and Kiskadden's property. R.R. at 655a.

Kiskadden's well sits southwest of the Yeager Site. Situated in between are properties owned by the Voyles and Haney families. F.F. No. 110, *see* R.R. at 7136a. Yet, the Board found Voyles and Haney water supplies, which the Department tested in November 2010 and February 2011, showed lower levels of chlorides, sodium, TDS and pH than the samples taken at Kiskadden's well. F.F. at 112.

In February 2011, the Department sampled and tested Voyles' water supply by taking water from a spring on the property as well as water from the basement sink. As for the sample taken from Voyles' spring, Yantko testified the chloride level was 12 mg/l, sodium was 8.107, and pH was 7.3. R.R. at 44a; *see*

R.R. at 8413a. The Department did not consider the water polluted or impacted by Range because the numbers were below the recommended maximum contaminant levels (MCLs). R.R. at 44a. As for the sample taken from the basement, Yantko testified chloride was 22.9 mg/l, sodium was 57.3 mg/l and pH was at 7.8. R.R. at 44a; *see* R.R. at 8414a. Although Yantko testified the sodium level was high, chloride remained below the recommended levels. R.R. at 44a-45a.

Regarding Haney's water supply, which the Department sampled and tested in November 2011, Yantko testified TDS were 468 mg/l; chloride was 12.3 mg/l; sodium was 25.2 mg/l; and pH was 7.4. R.R. at 45a; *see* R.R. at 8410a-11a. Again, Yantko testified these levels were not indicative of drilling activities. R.R. at 45a.

The Board found springs in particular provide helpful information about groundwater migration. F.F. No. 113. The water samplings between the Yeager Site and Kiskadden's well had lower concentrations of contaminants than Kiskadden's well. In contrast, the contamination in Yeager Springs after the March 2010 leak provided evidence of groundwater moving in a northwest direction. As the Board reasoned, this data refutes the theory that the contamination is moving southwest towards Kiskadden's well through a series of fractures. Board's Adjudication at 38.

The Board also found Kiskadden's water chemistry is similar to that of his mother's, Grace Kiskadden, in that they both show high levels of sodium and alkalinity, high pH, lower chlorides and similar TDS, calcium and methane. F.F. Nos. 138, 139. Grace Kiskadden's well is located approximately 0.2 miles upstream from Kiskadden's well, along Bane Creek Valley. F.F. No. 137.

However, a topographic ridge to the east of her well acts as a barrier, hydrogeologically separating her well from Range. F.F. Nos. 140, 141.

In support, Eichler opined Kiskadden's water well is similarly situated to Grace Kiskadden's well, as they are both in the Bane Creek Valley. R.R. at 737a. Eichler opined the water quality between the two wells look virtually identical. R.R. at 737a. Yet, Eichler testified Grace Kiskadden's well was not influenced by the activities at the Yeager Site. R.R. at 737a. As Morgart testified, Grace Kiskadden's well is hydrogeologically separated from the Yeager Site by a ridge, while Kiskadden's well is not. R.R. at 612a-13a. Ridges act as geologic barriers that prevent water and other fluids from effectively crossing. R.R. at 613a. The similarity between Kiskadden's well water and his mother's well water provides additional support for the Board's finding that the condition of Kiskadden's water is naturally occurring.

### 7. Suite Codes

Notwithstanding, Kiskadden argues the Board assigned too much weight to the absence of chloride. He asserts chloride is not the sole parameter examined in water contamination investigation. Indeed, the Department utilizes a standard analysis code in its water supply investigations called a "946 Suite Code." R.R. at 837a. The 946 Suite Code contains parameters associated with oil and gas development, including: specific conductance, pH, alkalinity, TDS, hardness, calcium, magnesium, sodium, potassium, chloride, sulfate, arsenic, barium, iron, manganese, strontium, zinc, aluminum, lithium, selenium, residue, and turbidity. R.R. at 837a.

33

However, the Board and the experts examined these other constituents. As discussed above, they are naturally occurring in Washington County groundwater or are not unique to oil and gas operations. Although many of these constituents were detected in Kiskadden's well water, they were not detected in such concentrations and ratios indicative of oil and gas operations. Based on the credible expert testimony regarding the importance of chlorides as well as pre-drill and post-drill samplings from the Yeager Springs, which showed a significant increase in chloride concentrations, the Board's finding that chloride was a key contaminant is well founded.

## 8. Hydrogeological Connection - Pathway

Finally, the Board found Kiskadden did not show *how* the contaminants physically traveled from the Yeager Site to his well. Board's Adjudication at 37-39. Specifically, the Board found that the shale rock near the Yeager Site is a poor transmitter of water. F.F. No. 161. Fractures tend to fill with clay. F.F. No. 161. Siltstone and limestone in the Greene and Washington Formations tend to be poor transmitters of water. F.F. No. 162. Instead of moving through rock units in the area of Kiskadden's well, the Board found groundwater tends to move laterally along the bedding planes. F.F. No. 164. The contamination in Yeager Springs provided evidence of groundwater moving in a northwest direction. Board's Adjudication at 38.

Although Kiskadden's expert, Rubin, testified that a hydrogeological connection between the Yeager Site and Kiskadden's well existed through underground network of fractures, surface connection, and deep migration connection, the Board rejected Rubin's testimony as not credible. *Id*.

34

Instead, the Board relied on the testimony of Morgart and Perry. Morgart examined the geology and hydrogeology of the Yeager Site as a whole and then evaluated whether there was a hydrogeological connection between the Yeager Site and Kiskadden's water supply. Morgart testified groundwater mimics topography in Western Pennsylvania. R.R. at 598a. Although Morgart testified it was "possible" that fluid discharged at the Yeager Site could end up in Kiskadden's water, he qualified saying it was not likely given the "impermeable nature of the rocks in question." R.R. at 641a. He opined there was no obvious hydrogeological connection between Kiskadden's well water and the Yeager Site. R.R. at 648a. He explained they would need to be in a "similar lithic unit." R.R. at 648a.

Perry reached a similar conclusion. Perry testified "formations in Southwestern Pennsylvania are layers of a variety of different lithologies," such as shale and limestone. R.R. at 1885a. Perry examined regional studies that characterized the groundwater flow system in Southwestern Pennsylvania and information at the Yeager Site, including the location of the numerous springs. R.R. at 1783a. At the Yeager Site, the layers of shale and limestone are considered less permeable. R.R. at 1784a. She testified groundwater originates as rainwater, falls on the ground surface, percolates into the subsurface and moves through various layers of geologic materials until it reaches a more impermeable layer, at which point it flows horizontally, as opposed to percolating vertically. R.R. at 1784a. Groundwater will continue flowing along that layer horizontally until it intersects the ground surface and manifests as a spring. R.R. at 1784a.

Perry testified that the groundwater pathway from the Yeager Site is not towards Kiskadden's water well. R.R. at 1762a. She explained that the strata

35

of lower permeability in the vicinity of the Yeager Site would prevent groundwater from penetrating vertically and would instead cause the groundwater to perch on top and travel horizontally in the direction of the Yeager Springs, which are northwest from the Yeager Site. R.R. at 1785a.

Kiskadden challenges the Board's reliance on Perry's testimony because she conceded releases of oil and gas fluids had the "potential" to reach shallow groundwater within 500 feet of the surface. However, when read within the context, this testimony did not pertain to the hydrogeology of the Yeager Site or the surrounding area. R.R. at 1873a. Perry expressed the opinion in an article that had nothing to do with the Yeager Site. R.R. at 1873a. When questioned whether or not a leak or release of oil and gas fluids could impact shallow groundwater approximately 500 feet deep, she responded it "depends" because "it's a very site specific situation." R.R. at 1873a. She explained, "I provided the depth of 500 feet as a definition of shallow groundwater to distinguish it from the deeper saline groundwaters." R.R. at 1873a. She reiterated, "It would really depend on the site-specific situation." R.R. at 1873a. Perry did not recant her testimony that the strata of lower permeability in the vicinity of the Yeager Site would prevent groundwater from penetrating vertically and would instead cause the groundwater to perch on top and travel horizontally in a northwest direction, not southwest towards Kiskadden's well. R.R. at 1785a.

Notwithstanding, it was Kiskadden's burden to prove a hydrogeological connection between the Yeager Site and his water supply. It was not Range's burden to prove its non-existence. Ultimately, the Board found Kiskadden did not meet his burden.

Upon review, we conclude that the Board's findings are supported by substantial evidence. Although we recognize that the record contains some evidence that supports Kiskadden's position, it also contains substantial evidence that supports the Board's findings and its ultimate determination that Kiskadden did not prove the existence of a hydrogeological connection. While Kiskadden points to evidence in his favor, he falls short of demonstrating that the Board's findings are not supported by substantial evidence. Simply because the Board could have made other findings based on the evidence does not mean the Board's findings are not properly supported. The Board is the sole finder of fact and has discretion regarding witness credibility, weight of the evidence, and resolution of conflicts of evidence, not this Court. *See Brockway.* In our appellate role, we "will not reevaluate the credibility of witnesses, any conflicts of evidence or the weight the Board afforded the evidence." *Eureka Stone Quarry, Inc. v. Department of Environmental Protection*, 957 A.2d 337, 349 (Pa. Cmwlth. 2008). As the Board's findings are supported by substantial evidence, we cannot disturb them on appeal.

### B. Capricious Disregard of the Evidence

Next, Kiskadden maintains that the Board capriciously disregarded evidence. According to Kiskadden, the Board's adjudication demonstrates a "consistent disregard for critical pieces of evidence" and "is based upon an exclusionary review of the evidence." Petitioner's Brief at 63.

Specifically, he claims the Board ignored competent evidence demonstrating the existence of a hydrogeological connection between his water well and the natural gas operations occurring at the Yeager Site. Kiskadden

37

maintains the definitive test clearly established the transport of constituents from the Yeager Site to his well. Yet, the Board's adjudication is bereft of any discussion or acknowledgement of this theory. Kiskadden also asserts the Board disregarded contaminants in Kiskadden's water as not attributable to activities at the Yeager Site, in defiance of the presumption.

Further, Kiskadden contends that the Board disregarded evidence regarding fractures and found the layers impermeable. He claims the Yeager Site is well-fractured. Even Perry conceded that oil and gas fluids had the potential to reach shallow groundwater. R.R. at 1873a-74a.

"Review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court." *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002). Capricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence. *Id*. Where substantial evidence supports the findings, and those findings in turn support the conclusions, it should remain a rare instance where an appellate court disturbs an adjudication based on capricious disregard. *Wintermyer*.

We may conclude that a fact-finder has capriciously disregarded competent evidence "when the unsuccessful party below has presented 'overwhelming evidence' upon which the adjudicator could have reached a contrary conclusion, and the adjudicator has not satisfactorily addressed that evidence by resolving conflicts in the evidence or making credibility determinations that are essential with regard to the evidence." *Balshy v. Pennsylvania State Police*, 988 A.2d 813, 835-36 (Pa. Cmwlth. 2010) (quoting

38

*Grenell v. State Civil Service Commission*, 923 A.2d 533, 538 (Pa. Cmwlth. 2007)). "In other words, where there is strong 'critical' evidence that contradicts evidence supporting a contrary determination, the adjudicator must provide an explanation as to how it made its determination." *Id*. at 836.

However, the fact-finder "is not required to address each and every allegation of a party in its findings, nor is it required to explain why certain testimony has been rejected." *Balshy*, 988 A.2d at 836. The pertinent inquiry is whether the Board's findings are supported by substantial evidence. *Id*. "The findings need only be sufficient to enable the Court to determine the questions and ensure the conclusions follow from the facts." *Id*.

Our review of the record in this matter reveals that the Board did not improperly disregard evidence presented by Kiskadden. Rather, the Board considered the evidence and made determinations as to weight and credibility, which are not subject to appellate review. Although the Board did not mention the "definitive test" by name, it is manifest that the Board considered and rejected this theory in its adjudication.

The Board found that a number of constituents found in the sampling at the Yeager Site were also present in Kiskadden's water. F.F. No. 94. However, the Board also found that many of the constituents were naturally occurring or not unique to drilling. F.F. Nos. 77, 95; Board's Adjudication at 47. Thus, the Board concluded: *"their mere detection in a sample is not enough to prove a hydrogeologic connection."* Board's Adjudication at 47 (emphasis added). For this reason, the Board focused on quality, i.e. concentrations and ratios, as opposed to mere detection of contaminants at both sites. Ultimately, the Board found the parameters of contaminants in Kiskadden's water well did not reflect oil and gas

operations. As addressed above, the Board's findings in this regard are well supported by substantial evidence. These findings undermine Kiskadden's "definitive test" theory and support the Board's conclusion that Kiskadden did not sustain his burden of proving a connection through water chemistry.

Insofar as Kiskadden asserts the Board failed to employ the presumption that contaminants in his well water were present at the Yeager Site, the presumption was rebuttable and rebutted. A rebuttable presumption is not absolute or unassailable. *Commonwealth v. McNeil*, 439 A.2d 664, 667 (Pa. 1981). It is merely an assumption of fact until it is disproved. *Id*. Contrary to Kiskadden's assertions, the Board did not act in defiance of the presumption by allowing opposing parties to disprove the presumption.

As for the fractures, Rubin attempted to show a hydrogeological connection between the Yeager Site and Kiskadden's well through an underground network of fractures, surface connection, and deep migration connection. However, the Board did not find Rubin's testimony credible. The Board explained "Rubin's theory is dependent on the fractures that he observed in the drill cuttings pit continuing underground. However, [he] admitted that fractures can 'anneal' or close with depth." Board's Adjudication at 37. Clearly, the Board considered Kiskadden's evidence of a hydrogeological connection, but ultimately determined it was outweighed by contrary evidence offered by the Department and Range. A determination that evidence is not credible or is outweighed by conflicting evidence is not a capricious disregard of that evidence. *Balshy*, 988 A.2d at 836.

40

## C. Speculative Evidence

Finally, Kiskadden asserts the Board improperly relied on speculative evidence when noting the existence of other factors that could reasonably explain his water well pollution. Contrary to Kiskadden's assertion, the Board acted well within its fact-finding role when it considered other possible explanations for the condition of Kiskadden's well water. The constituents detected in Kiskadden's water have possible sources on or nearby his property and were not prominent components of sources found at the Yeager Site. Kiskadden testified his family operated a salvage yard on the property from the 1960s before ceasing operations a few years ago. R.R. at 904a. Kiskadden testified his family removed gas tanks and drained fluids from salvaged cars on the property. R.R. at 904a. They stored the fluids in 55-gallon drums for reuse. R.R. at 904a. His family also washed cars on the property. R.R. at 904a. He testified he has a septic system on the property, which was never serviced. R.R. at 904a. Kiskadden also admitted his well has not been properly maintained, tested or protected from contamination from operations on his own property. R.R. at 902a.

Moreover, Perry testified Kiskadden's well is not isolated from the ground surface and the cap is not sealed, which provides a mechanism for surface water infiltration into the well. R.R. at 1792a. She testified the occurrences of mud on his well wires as well as fecal coliform in the water supply are both indicators of surface infiltration. R.R. at 1791a-92a.

The Board merely noted the existence of other factors that could reasonably explain Kiskadden's water well pollution. Such evidence was not offered to prove that these other factors were the source of contamination, but to rebut or cast doubt over Kiskadden's evidence that Range was the only possible

cause of the contamination. Contrary to Kiskadden's assertions, the Board did not err by considering this evidence.

## IV. CONCLUSION

The safety of Pennsylvania's water is essential to Pennsylvania's welfare. *See* Section 2(a)(1) of the Pennsylvania Safe Drinking Water Act[15] ("pure drinking water is essential to the public health, safety and welfare . . . ." ); Section 4(2) of the Clean Streams Law[16] ("Clean, unpolluted water is absolutely essential . . . ."). Potential contamination from oil and gas operations poses a serious threat to the health of our residents, environment and economy. We must vigilantly guard against such perils.

Range's reckless business practices, combined with its repeated failure to report problems at the Yeager Site, are irresponsible in the extreme, bordering on reprehensible. The list of leaks and spills at the Yeager Site is troubling. Although there is little dispute that the activities at the Yeager Site impacted the environment and contaminated the soil and adjacent springs, the issue before this Court was whether Range's activities impacted Kiskadden's water well.

To that end, it was Kiskadden's burden to prove that the Yeager Site was more probable than not the source of contamination of his water well. We have examined the evidence in this matter very carefully. Although Kiskadden presented a great deal of evidence, unfortunately, that evidence did not carry the day before the Board. Kiskadden's evidence did not outweigh strong, conflicting

---

[15] Act of May 1, 1984, P.L. 206, 35 P.S. §721.2(a)(1).

[16] Act of June 22, 1937, P.L. 1987, added by the Act of August 23, 1965, P.L. 372, *as amended,* 35 P.S. §691.4(2).

evidence that the contaminants in his well water, particularly in the ratios and concentrations detected, were naturally occurring and not unique to oil and gas activities. Moreover, his evidence did not prevail over other credible evidence refuting the existence or likelihood of a physical pathway between his well and the Yeager Site.

Taking into consideration our appellate role and the weight and credibility assigned to the evidence by the Board, we are constrained to conclude that the Board's findings are supported by substantial evidence and that the Board did not capriciously disregard the evidence or improperly rely on speculative evidence. The Board's findings support the conclusion that Kiskadden did not prove by a preponderance of the evidence that a hydrogeological connection exists between his water well and Range's operations at the Yeager Site.

Accordingly, we affirm.

MICHAEL H. WOJCIK, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Loren Kiskadden,                 :
                                     : No. 1167 C.D. 2015
                 Petitioner    :
                                       :
                v.                 :
                                       :
Pennsylvania Department of       :
Environmental Protection,         :
                                       :
                Respondent   :

## O R D E R

AND NOW, this <u>26</u><sup>th</sup> day of <u>October</u>, 2016, the adjudication of the Pennsylvania Environmental Hearing Board, dated June 12, 2015, is AFFIRMED.

_____

MICHAEL H. WOJCIK, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Loren Kiskadden, : 
        Petitioner : 
  : No. 1167 C.D. 2015
      v. : 
  : Argued: April 13, 2016
Pennsylvania Department of : 
Environmental Protection, : 
        Respondent : 


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE ROBERT SIMPSON, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge


DISSENTING OPINION BY
JUDGE McCULLOUGH              FILED: October 26, 2016


The Environmental Hearing Board's (Board) grant of a rebuttable evidentiary presumption to Kiskadden established that the chemicals found in his well water were contained in products used at the "Yeager Site." Because the Board did not find that this presumption was rebutted, I must respectfully dissent from the thoughtful and well-written Majority.

Loren Kiskadden (Kiskadden) owns residential property and his well water became contaminated. At the same time, Range Resources-Appalachia, LLC (Range) was performing oil and gas drilling operations at the "Yeager Site," which is located approximately a half of a mile away. Perhaps significantly, the Yeager

Site is situated on a hilltop and the Kiskadden property is situated down below, in a valley. The Yeager Site has a prolific history of numerous leaks and spills – at least eighteen that we know of. (Findings of Fact at Nos. 45-64; Adjudication at 3-4.) Kiskadden filed a complaint with the Department of Environmental Protection (Department), and water quality testing was conducted by the parties and the Department.

Eventually, the Department denied Kiskadden relief. Although the Department concluded that Kiskadden's well water was contaminated, the Department determined that the pollutants in the water supply did not originate from the Yeager Site. Kiskadden then appealed to the Board, and after Range failed to respond to a discovery request, the Board granted Kiskadden a rebuttable evidentiary presumption. (Adjudication at 4-5.)

Specifically, this presumption "eliminated [Kiskadden's] need to prove that chemicals found in his well water were contained in products used at the Yeager Site." (Adjudication at 6.) Stated differently, the Board presumed that the chemicals discovered in Kiskadden's well water were present at the Yeager Site, the origin of the contamination. Without doubt, this is a remarkable presumption that is extremely damaging to Range, having the practical effect of assuming that, in terms of contaminants, those found at the Yeager Site were the same as those in the well water. It is also a presumption that was never found to have been rebutted by the Board. Nevertheless, the Board concluded that Kiskadden failed to establish that a hydrogeological connection existed between the well and the Yeager Site, i.e., that the chemicals traveled from the Yeager Site to the well.

During the hearing before the Board, Kiskadden adduced volumes of empirical data showing a highly positive (if not nearly perfect) correlation between

the constituents found at the original place of the contamination, the Yeager Site, and the contamination at the well. By no means an exhaustive list, the following elements and/or compounds – sometimes called "parameters" – were located at both the Yeager Site and in the well water: iron, chloride, sulfate, strontium, magnesium, methane, ethane, aluminum, barium, sodium, manganese, cobalt, chromium, copper, silicon, lithium, tin, vanadium, zinc, boron, titanium, oil and grease, ethyl benzene, propane, o-exylene, m-exylene, p-exylene, sulfur, uranium, toluene, acetone, and arsenic. (*See* Kiskadden's brief at Appendix A-C.) The Board found, as a matter of fact, that "[a] number of constituents found in sampling at the Yeager Site were also present in [Kiskadden's] water." (Findings of Fact at No. 94.) As Kiskadden observes in his brief, "the parameters detected in the soil samples [of the Yeager Site] mirror the parameters detected in [Kiskadden's] water in almost every instance, including detections of both heavy metals and volatile organic compounds." (Kiskadden's brief at 26; *see* Reproduced Record (R.R.) at 1103a-05a.)

The Department's witnesses, Michael Morgart, a geology and hydrogeology expert, and Alan Eichler, an expert on water investigations and isotopic gas evaluations, both testified that a hydrogeological connection can be established if a contaminant found at Point A (the Yeager Site) is discovered at Point B (the well).

Morgart testified:

> I would think [this] would be a great way of showing that there was a connection if you had maybe not just one chemical parameter but a whole host of parameters and they showed up in the same – probably not the same concentrations because of the dilution rates that we talked about but also everything that was spilled, let's

say, should travel through the same pathway. That would be a great indicator that there was a connection.

* * *

Q. . . . Do there exist any definitive tests that you know, as a professional geologist, that would enable you to definitively say this is where the fluid went in this particular area given the geology? . . .

A. . . . [T]he tests would be quality related, if you had a sample from point A and the same fluid comes out at point B, that would indicate that a lot of parameters from the spill discharge, whatever you want to call it, at point A, came to point B, not just selective ones showed up there.

(R.R. at 631a-32a.)

Eichler testified:

Q. And so, would it ever . . . be important information that you have a potential site of a leak, if the same chemicals were at that leak and you then later find them in a complainant's water source, is that an important piece of information in contaminant transport and groundwater flow and pathways?

A. Oh, it is extremely important.

Q. Why is that?

* * *

A. [If] you have a contaminant that, you know, is known from a certain source area, [and] comes out another location, especially one type of parameter that isn't naturally occurring or isn't found in that particular environment or sometimes that maybe it is . . . then yes.

It is always best to look at more than one parameter. To hang your hat on one parameter when there are multiple ones out there, it just doesn't utilize all your data wisely.

PAM - 4

(R.R. at 947a-48a.)

Given Kiskadden's empirical data and the testimony of Morgart and Eichler, Kiskadden adduced sufficient evidence to establish a hydrogeological connection between the Yeager Site and the well. The unrebutted presumption that the chemicals found in Kiskadden's well water were present at the Yeager Site solidifies the fact that Kiskadden met his burden of proof. When considered in tandem, the presumption, Kiskadden's empirical data, and other evidence conjoin to constitute conclusive evidence that there was a hydrogeological connection. Indeed, the Board found that Kiskadden's water exhibits high levels of sodium and total dissolved solids, which was typical of water chemistry in gas well operations. (Findings of Fact at Nos. 97-98.)

Despite all this proof, the Board found that "[a] number of the constituents found in [Kiskadden's] water can be naturally occurring" and faulted Kiskadden's empirical data because the well water did not exhibit a high level of chlorides. (Findings of Fact at Nos. 95-98.) The Board concluded:

> [Kiskadden] produced hundreds of pages of sampling results showing that numerous parameters had been detected in [the well water] that were also detected in sampling at the Yeager site. The problem is that most of those parameters *can also* be found naturally in groundwater. Thus, their mere detection in a sample is not enough to prove a hydrogeologic connection. Those that are not found naturally in groundwater are also associated with products and activities unrelated to hydraulic fracturing operations.

(Adjudication at 47) (emphasis added).

In my view, the Board's reasoning is at odds with the presumption that the chemicals found in Kiskadden's well water were present at the Yeager Site. Importantly, the Board never determined that the presumption was rebutted

by affirmative evidence to the contrary. In essence, the Board basically reversed the presumption it granted to Kiskadden against Kiskadden, by hypothesizing that the parameters "could have" come from somewhere else, when it should have presumed that they came from the Yeager Site. Ignoring Kiskadden's empirical data and the effect of the presumption, the Board dismissed Kiskadden's case and the highly positive correlation between the well water and the Yeager Site as mere happenstance, coincidence, or fortuity. Because the Board failed to properly apply the presumption in the context of this case, and, for all intents and purposes, never provided Kiskadden with the benefit of that presumption, I would vacate and remand to the Board to rectify this legal error with the appropriate findings of fact and analysis.

Accordingly, I respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge