Marina O. Matthew,            :
                Petitioner    :
                             :
           v.                :
                             :
State Civil Service Commission  :
(Department of Health),      :   No. 1563 C.D. 2016
                Respondent  :   Submitted: May 12, 2017

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                      FILED: September 6, 2017

          Marina O. Matthew (Matthew) petitions this Court for review of the State Civil Service Commission's (Commission) August 23, 2016 adjudication and order (Adjudication) dismissing her appeal challenging the Department of Health (Department) removing her as its Public Health Program Director. Matthew presents seven issues for this Court's review: (1) whether the Department met its burden of proving that Matthew authorized a vendor to perform work without a contract; (2) whether the Department met its burden of proving that Matthew's actions constituted contract violations; (3) whether the Department established that Matthew was responsible for procurement; (4) whether the Commission erred by not making findings relative to SueAnn Caruso's (Caruso) role in the procurement process; (5) whether the Commission erred by failing to consider Matthew's 24-year work performance record; (6) whether the Department met its burden of proving just cause for Matthew's removal from a civil service position for actions taken when she held a

non-civil service position; and (7) whether the Commission's Adjudication was based on arbitrary and capricious reasoning.

Matthew was employed by the Department as Acting Director of its Bureau of Health Statistics and Research (BHSR) from January 19, 2011 until she was formally promoted to BHSR Director, a non-civil service position, effective July 2, 2011.[1] Matthew served as BHSR Director until the Department's Deputy Secretary for Administration Anne Baker (Baker) reassigned Matthew to serve as Director of the Department's Bureau of Women, Infants and Children (WIC), effective June 21, 2014, for reasons unrelated to the instant removal action.[2] Matthew's job as WIC Director was a civil service position.

VitalChek Network, Inc. (VitalChek) is a company from which the Department acquired Database Application for Vital Events (DAVE) software for BHSR's birth and death records. The Department purchased VitalChek software and its standard maintenance and support under the Commonwealth's contract with DELL (formerly ASAP). Subsequent enhancements to DAVE were to be procured pursuant to an Invitation to Qualify (ITQ[3]) under which VitalChek was a pre-qualified vendor. When BHSR needed VitalChek work done, either under the DELL contract or the ITQ, a work order would be developed describing the work needed, and the Department's Bureau of Information Technology (BIT) would issue a

---

[1] The parties stipulated to the procedural background of this action at the December 2, 2014 pre-hearing conference. *See* Reproduced Record (R.R.) at 10a-11a, Joint Stipulations, 17a.

[2] "Baker felt that Matthew was taking BHSR in a different direction from that envisioned by leadership, and Matthew was unable to embrace that vision." Department Br. at 8; *see also* Matthew Br. at 10. According to the record, Baker reassigned Matthew before she was aware of the circumstances underlying Matthew's removal. *See* Department Br. at 8.

[3] ITQ "is a commonly-used term for the invitation for bids or request for proposals that is used to solicit bids or proposals for the multiple award method of procurement. It is also used to identify the document that solicits applications or proposals for the qualification of bidders and offerors." Certified Record Notes of Testimony (N.T.) Ex. AA-44.

purchase order[4] against the applicable contract authorizing payment for the requested work. Matthew approved and signed the work orders as BHSR Director.

In accordance with the Commonwealth's procurement policies, regardless of whether the DELL contract (for maintenance and support) or the ITQ (for enhancements) was implicated, there had to be a contract in effect from which a purchase order could be issued and under which invoices could be paid.[5] The Commonwealth's procurement policies prohibit the Department from paying for work conducted outside a valid contract. BIT ultimately installed BHSR's DAVE enhancements. Caruso was the independently-contracted project manager BIT retained for BHSR's DAVE enhancement work.

On June 26, 2014, BIT Chief Patrick Keating (Keating) received an email request from VitalChek for approval to invoice the Department for work orders totaling $557,252.00, which Matthew approved and signed between August 16, 2013 and February 14, 2014.[6] *See* Reproduced Record (R.R.) at 257a-259a (Certified Record Notes of Testimony (N.T.) Ex. AA-1), 323a-444a. Because neither VitalChek nor Keating were able to produce a purchase order authorizing the services

---

[4] A purchase order is a "[w]ritten authorization for a contractor to proceed to furnish a supply [or] service in accordance with the terms of the bid document or sole source and the awarded bidder's bid or a Contract." N.T. Ex. AA-44.

[5] Part I, Chapter 04 of the Commonwealth's Procurement Handbook specifies that "[n]o contract shall be implemented, nor shall any materials [or] services . . . be accepted or work begun on any contract not processed, executed, and approved in accordance with policies and procedures in [the Commonwealth's Procurement Code] or this [Procurement H]andbook." R.R. at 307a (N.T. Ex. AA-42). Moreover, "any individual giving permission to accept materials [or] services . . . to begin work before a contract is completely approved, in violation of this policy, may be held personally responsible." R.R. at 307a.

[6] VitalChek's invoice approval request covered the following DAVE enhancement work orders: 1665 (Matthew approved 8/16/13), 1672, 1675, 1676, 5811, 5816, 5897, 6537, 7778, 7779, 8028, 8168, 8534, 9745, 9792, 9817, 9903, 9942, 10009, 10031, 10227, 10623, 10699, 11311, 11412, 11433, 11517, 11645, 11682, 11717, 11718, 11721, 11770, 11924, 11966, 12023, 12057, 12058, 12096, 12204, 12205, 12206, 12229, 12256, 12263, 12266, 12451 (Matthew approved 2/14/14), 12490. *See* R.R. at 258a-259a, 323a-444a. Work Order No. 12490 was not included in the record. On the invoice approval list, Work Order No. 12490 is marked "HOLD." R.R. at 259a.

for which Matthew approved the work orders, Keating instructed VitalChek to stop work. Keating's investigation further revealed that VitalChek delayed invoicing for its DAVE enhancements during the 2013-2014 fiscal year at Matthew's request. Keating also discovered that Matthew had attempted to pay VitalChek using Commonwealth purchasing cards. "As a result of VitalChek performing work without a proper contract, the [Department had to] enter[] into a settlement agreement to pay invoices for an amount in excess of $800,000.00." *See* Matthew Br. App. A (Commission Adj.) at 12, Finding of Fact (FOF) 43.

At a July 25, 2014 pre-disciplinary conference, the Department's Labor Relations Human Resource Analyst Jerry Sheehan (Sheehan) notified Matthew that she was being suspended from her employment pending an investigation into allegations of her unsatisfactory work performance and policy violation. *See* R.R. at 1a. By July 30, 2014 letter, the Department directed Matthew's employment suspension effective July 25, 2014. *See* R.R. at 1a-2a. On August 13, 2014, Matthew appealed from her suspension to the Commission. *See* R.R. at 3a-5a. However, by August 15, 2014 letter, the Department notified Matthew:

> This is to advise you that you are being removed from your position of Public Health Program Director, Regular Civil Service status, in the Bureau of WIC effective August 18, 2014.
>
> You are removed from employment due to Unsatisfactory Work Performance and Violation of Policy. Specifically, you failed to adequately manage the procurement activity of the [BHSR] during your term as Bureau Director, and you violated procurement policy when you authorized a vendor to perform work without a contract in place.
>
> A pre-disciplinary conference was held with you on July 25, 2014, and the response you provided was not acceptable.

R.R. at 6a.

4

On August 27, 2014, Matthew appealed from her discharge to the Commission. *See* R.R. at 8a-9a. Pursuant to Section 951(a) of the Civil Service Act (Act),[7] hearings were held on December 5, 2014 and January 28, 2015 to determine whether the Department had just cause for Matthew's removal. *See* R.R. at 12a-491a. On August 23, 2015, the Commission concluded that the Department established just cause as required by Section 807 of the Act,[8] and dismissed Matthew's appeal.[9] *See* Commission Adj. at 24. Matthew appealed to this Court.[10]

Initially, Section 807 of the Act provides that "[n]o regular employe in the classified service shall be removed except for just cause." 71 P.S. § 741.807. Consequently, "[t]he appointing authority bears the burden of proving just cause and the substance of the charges underlying the employee's removal." *Dep't of Transp. v. State Civil Serv. Comm'n*, 84 A.3d 779, 783 n.1 (Pa. Cmwlth. 2014). Since "[t]he term 'just cause' is not defined in the Act[,]" *Woods v. State Civil Serv. Comm'n*, 912 A.2d 803, 808 (Pa. 2006),

> [t]his Court has explained that 'just cause for removal is largely a matter of discretion on the part of the head of the

---

[7] Act of August 5, 1941, P.L. 752, *as amended*, added by Section 27 of the Act of August 27, 1963, P.L. 1257, 71 P.S. § 741.951(a) .

[8] 71 P.S. § 741.807.

[9] The Commission explained:

> Under Section 101.21(6) of the Rules of the [Commission], when a suspension, pending investigation, results in a final disciplinary action, the suspension is deemed a part of that final disciplinary action. 4 Pa. Code § 101.21(6). Appellant was suspended pending investigation effective July 25, 2014, and subsequently removed effective August 18, 2014. Accordingly, the Commission will treat this matter as a removal effective July 25, 2014.

Commission Adj. at 1 n.1.

[10] "The Court's review of a decision of the Commission is limited to determining whether constitutional rights have been violated, [whether] errors of law have been committed or whether its findings are supported by substantial evidence." *Walsh v. State Civil Serv. Comm'n (Dep't of Transp.)*, 959 A.2d 485, 488 n.2 (Pa. Cmwlth. 2008).

department.' *Perry v. State Civil Serv*[.] *Comm*[']*n (Dep*[']*t of Labor* [&] *Indus*[.]*,* 38 A.3d 942, 951 (Pa. Cmwlth. 2011). However, 'just cause 'must be merit-related and the criteria must touch upon [the employee's] competency and ability in some rational and logical manner.'' *Wei v. State Civil Serv*[.] *Comm*[']*n (Dep*[']*t of Health),* 961 A.2d 254, 258 (Pa. Cmwlth. 2008) (quoting *Galant v. Dep*[']*t of Env*[*tl*.] *Res*[.]*,* . . . 626 A.2d 496, 498 n.2 ([Pa.] 1993)). . . . 'Whether the actions of a civil service employee constitute just cause for removal is a question of law fully reviewable by this Court.' *Perry,* 38 A.3d at 951.

*Szablowski v. State Civil Serv. Comm'n (Pa. Liquor Control Bd.)*, 111 A.3d 256, 261 (Pa. Cmwlth. 2015).

In the instant case, Matthew argues that the Department did not prove just cause for her removal, particularly because it failed to establish that she authorized VitalChek work without a contract, where it is undisputed and the Commission found that there were two contracts in place.[11] Essentially, Matthew argues that the Commission's findings were not supported by substantial evidence. We disagree.

---

[11] Relative to Matthew's issue that the DELL contract and ITQ were not made part of the record, since Matthew appears to have raised that objection for the first time on appeal to this Court, it is waived. *Martin v. State Civil Serv. Comm'n (Dep't of Cmty. & Econ. Dev.)*, 741 A.2d 226, 230 (Pa. Cmwlth. 1999) ("[N]o question shall be heard or considered by the [C]ourt which has not been raised before the government unit. Pa.R.A.P. 1551."). Notwithstanding, since the work order approvals that led to Matthew's removal were not based upon either the DELL contract or the ITQ, their absence from the record does not render the Commission's decision erroneous. Moreover, despite being afforded the opportunity to do so, Matthew did not challenge Department witness testimony relative to what the contracts covered and how purchases were to be made thereunder.

Matthew's claim that the Commonwealth's procurement policy is missing from the record, which was made for the first time in her brief to this Court, *see* Matthew Br. at 1, is likewise waived. However, even if that issue was not waived, the Department included in the record excerpts from the Commonwealth's Procurement Handbook (*see* R.R. at 307a-320a (N.T. Ex. AA-42), N.T. Ex. 43), IT Bulletins (*see* N.T. Exs. AA-7, AA-45), Management Directive (*see* N.T. Ex. AA-43), and the Department's Contract Bulletins (*see* N.T. Ex. AA-44). Further, despite being afforded the opportunity to do so, Matthew did not challenge Department witness testimony regarding the Commonwealth's IT procurement policies, practices and procedures.

Although there were contracts under which VitalChek software was purchased and maintained, and VitalChek was a DELL and ITQ pre-approved vendor, the record evidence makes clear that the DELL contract and the ITQ did not cover the procurements Matthew authorized herein. At the Commission hearings, BIT's Division of Enterprise Services Director Robert Chilcote (Chilcote) testified that VitalChek software and its standard maintenance and support were purchased under the DELL contract. *See* R.R. at 18a-20a, 29a. He explained that statements of work issued under the DELL contract defined the services DELL would provide, which included annual maintenance for defect or problem resolution and operational support. *See* R.R. at 19a. Chilcote articulated:

> A. Under the DELL contract, it was an annual maintenance contract. So every year, we would do an annual purchase order . . . . [T]here was always a purchase order in place to cover the work. And the vendor would invoice for the work against that purchase order that was covered by the DELL contract.
>
> Q. So under the DELL contract with the statement of work, a purchase order would be issued. What does the purchase order do for VitalChek?
>
> A. It's the authorizing document that authorizes the vendor to --- that they can perform the work.
>
> Q. And then, I believe you testified then there would be the invoice?
>
> A. The invoice is issued. For deliverable type services, it's issued after the vendor completes the service. For annual maintenance type work, like we have the DELL contract, it's typically for any vendor made up front at the beginning period as soon as the [purchase order is] issued. So that's your invoice. The Commonwealth would pay the invoice.
>
> Q. Okay. Did the ITQ contract work differently than the DELL software contract?
>
> A. Yes.

7

Q. And can you explain for the Commission what the differences are?

A. Typically, the DELL contract covered just the standard maintenance and support . . . . [Under t]he ITQ contract, . . . VitalChek was qualified [to] . . . do service engagements that cover enhancements that you couldn't do for the DELL contract or other service work within limits. You know, the up to $50,000 on a purchase order or two purchase orders for a maximum of $100,000 per year. So it provided for the enhancement capability and other services like dating the births, that we didn't have through the DELL contract.

R.R. at 19a-20a; *see also* R.R. at 30a, 33a, 36a. Chilcote described:

[T]he DELL contract [was for] standard maintenance and support. Any enhancements in the software provided would be provided by the [ITQ] vendor as [its] own line of business, upgrading [its] system for all the customers. In the ITQ contract, the enhancements we're talking about [are] enhancements that are specific for Pennsylvania to make it operational and provide updates for what Pennsylvania needed to have added into the system.

R.R. at 20a; *see also* R.R. at 30a, 33a, 36a.

Chilcote expounded:

The ITQ's a preexisting contract that's already been [through] a preapproval process, [and the vendor is] prequalified. But . . . a purchase order, . . . has to get issued. It goes through an approval process to approve the purchase order. So there is a Commonwealth approval process authorizing the vendor. . . . There has to be [a] document to authorize the vendor to do the work.

R.R. at 26a. Chilcote declared that BIT issued all of the Department's IT purchase orders. *See* R.R. at 31a. He testified that it was a longstanding practice, even before Matthew became Acting Director, for BHSR to work directly with VitalChek for its needs and, "if work was requested of [BIT] to get issued on a purchase order, [BIT] proceeded to do that. But otherwise, [BIT] had no involvement in deciding the work

8

orders or what was to be on a work order. It was part of [BHSR's] business." R.R. at 22a; *see also* R.R. at 24a, 28a, 40a, N.T. Ex. AA-11.

According to Chilcote, he notified the Department, including Matthew, as early as 2009 when the Department purchased DAVE's death module that enhancements thereto would not be covered by the DELL contract. *See* R.R. at 20a, 27a-28a; *see also* N.T. Ex. AA-9. He further recalled that there had come a time when BHSR required Pennsylvania-specific enhancements (*i.e.*, DAVE data conversion) that could not be made under the VitalChek's ITQ limitations. *See* R.R. at 20a-21a, 28a. Chilcote specifically notified Matthew of the ITQ's limitations by June 13, 2012 email, and further reminded Matthew that "[n]othing can be paid outside the [purchase order,]" and that, where applicable, the ITQ contract number must be referenced. N.T. Ex. AA-11; *see also* R.R. at 21a. Chilcote reminded Matthew and others by February 28, 2013 email regarding the Commonwealth's IT procurement review process. *See* R.R. at 24a-25a; *see also* N.T. Ex. AA-7. He recalled that BIT employees and independent contractors, including Caruso, met weekly with VitalChek regarding VitalChek's work, and that Department staff (including Matthew and BHSR) and BIT held twice-monthly meetings about the DAVE project. *See* R.R. at 39a.

Chilcote recalled that the Department decided to enter into a stand-alone, sole source contract with VitalChek that would cover services not provided under the DELL or ITQ contracts, plus maintenance, support and enhancements under a specifically-defined statement of work (Proposed Contract). *See* R.R. at 22a-23a. Chilcote explained that, some time in 2012, Department representatives, including Matthew, met and attempted to develop a statement of work for the Proposed Contract.[12] *See* R.R. at 23a-24a. He recounted that, although the DELL maintenance

---

[12] A statement of work "defines the services to be provided, the requirements to be met, and any service level agreements that are required[.]" R.R. at 19a. Service level agreements set forth

and support agreement had been extended several times through and beyond December 31, 2013, *see* R.R. at 33a, 38a, 54a, the Proposed Contract was not yet in place when Matthew issued the subject work orders.

Chilcote described, per Keating's direction, "looking to see if any purchase orders had been issued to cover the [VitalChek] work [Matthew requested]. And there weren't." R.R. at 27a. He further maintained that he looked for but did not find a contract that covered the subject work orders. *See* R.R. at 29a. He expressed that BIT Enterprise Development Services Director Karen Ford (Ford) emailed Matthew on July 7, 2014, informing Matthew that "none of those work orders [for which VitalChek intended to bill] were listed on the [two] ITQs that were done in the fall," and Ford "[could] find no record of any [purchase orders] for this work for [VitalChek] to bill against." N.T. Ex. AA-6; *see also* R.R. at 30a. Notably, Matthew admitted to Ford that no contract covered the work orders she issued:

> Per discussions in meetings going all the way back to last July [2013,] [V]ital[C]hek was supposed to have a contract on [sic] place. First [BIT] told them July the[n] October then January the[n] March then June. So seeing as how releases take awhile[,] everyone figured the contract would be in place before the releases. . . . **I guess they are now tired of waiting for a contract and are invoicing for work completed**.

R.R. at 269a (N.T. AA-6) (emphasis added); *see also* R.R. at 30a.

Keating testified at the hearings that since the Commonwealth's procurement policy requires there to be a contract in place for any procurement, "[y]ou can't engage services unless you have a contract." R.R. at 47a. He specified that, "[o]nce you have a contract in place with the vendor, then you issue a . . .

---

criteria the Commonwealth uses to hold a vendor to specific performance levels (*i.e.*, system must be operational 99% of the time). *See* R.R. at 22a. The Proposed Contract's statement of work was ultimately drafted by Commonwealth contractor Deloitte in November 2013, but the Department continued to refine it through at least the end of December 2013. *See* R.R. at 23a-24a.

purchase order[] against that contract, identifying the services that you want to be accomplished." R.R. at 44a. Keating confirmed that VitalChek software maintenance and support for BHSR was obtained by purchase orders issued under the DELL contract,[13] but that additional software enhancements had to be obtained by purchase orders issued against the ITQ. *See* R.R. at 44a-46a, 49a.

After receiving VitalChek's June 26, 2014 email, Keating instructed Chilcote and Caruso's replacement project manager Charu Pahwa (Pahwa)[14] to find any active purchase orders that would support the VitalChek work orders. Keating reported that Chilcote, Pahwa and VitalChek ultimately substantiated that there were no specific contracts or purchase orders authorizing the services VitalChek provided under the subject work orders. *See* R.R. at 47a. Keating further recalled VitalChek Vice President Greg Sirko (Sirko) confirming that there was not an existing Commonwealth contract covering the work orders, but rather Matthew had asked VitalChek to proceed with the work, and then invoice the Commonwealth after the Proposed Contract's statement of work was completed. *See* R.R. at 47a, 50a; *see also* N.T. 264a-266a (N.T. Ex. AA-3).

Pahwa explained her understanding that quality issues with VitalChek's 2011, 2012 and 2013 releases necessitated the repeated additional releases and, as a result, calendar time passed, and the 2013 releases were still being issued into the 2013-2014 fiscal year. *See* R.R. at 71a. She testified that, during her investigation of

---

[13] Keating described that VitalChek sends invoices for DELL contract-related work to DELL for payment, DELL invoices the Commonweath, the Commonwealth pays DELL, and the transaction is recorded in the Commonwealth's SAP procurement/financial tracking system. *See* R.R. at 46a.

[14] Pahwa was hired to replace Caruso as BIT's interim VitalChek project manager when Caruso's contract expired on June 30, 2014. *See* R.R. at 31a, 43a, 136a-139a. Pahwa began on June 23, 2014 to serve as project manager until BIT could hire Caruso's replacement. *See* R.R. at 43a, 60a. Pahwa and Caruso conducted a knowledge transfer for six days before Caruso's departure. *See* R.R. at 60a, 66a. Pahwa was the Department's VitalChek project manager until she was re-assigned on October 1, 2014. *See* R.R. at 66a.

11

this matter, she located all but one of the work orders for which VitalChek sought payment, but since she was not familiar with the project, she could not state whether the work orders had been satisfied and the work accepted.[15]  *See* R.R. at 63a. However, Pahwa learned that BIT was not involved in any way with the writing, reviewing or invoicing of the work orders at issue in this case.  *See* R.R. at 64a. Pahwa also found in BHSR's network a document entitled "Work Order Process Tracking," wherein BHSR's VitalChek work order payment process was outlined. *See* R.R. at 63a-64a, 69a; *see also* R.R. at 267a-268a (N.T. Ex. AA-4).  According to the "Work Order Process Tracking" instructions:[16]

> 1. Work orders are requested by the Program [project manager, Caruso] and can only be signed off on by [Matthew].
>
> 2. **The Program** [**project manager, Caruso**] **is only facilitating the movement of the work order** through the review life cycle including final approval and tracking them on the summary sheet.  **The Program** [**project manager, Caruso**] **is not involved in the payment process unless requested by** [**Matthew**].
>
> 3. **How the work order**[**s are**] **paid and/or the vehicle which is used to pay them is the responsibility of** [**Matthew**], [BHSR's Vital Records Director] Debra Romberger [(Romberger)] and [Chief of BHSR's Administrative and Fiscal Services Division] Cathy Sabol [(Sabol)].

---

[15] The missing work order was not signed because there was confusion surrounding its drafting, and a new work order was going to be created.  *See* R.R. at 65a.

[16] Despite Matthew's claim that she never saw the Work Order Process Tracking Document prior to her July 25, 2014 pre-disciplinary conference, and that she did not know who created it, she nevertheless **agreed that its contents were accurate** – particularly that she signed every VitalChek work order, and that Caruso could not make DAVE enhancement funding decisions.  *See* R.R. at 192a-193a.  Matthew confirmed that Caruso could not access funding or the budget and, if she needed funding figures, she had to obtain them from Matthew, BHSR's Vital Records Director Debra Romberger or Chief of BHSR's Administrative and Fiscal Services Division Cathy Sabol. *See* R.R. at 192a-193a.

12

R.R. at 268a (emphasis added); *see also* R.R. at 67a.  The document further specified that **the password for BHSR's DAVE work order files "must be authorized and given from** [**Matthew**], [Romberger], or [BHSR's Statistical Registries Director] Diane Kir[sc]h [(Kirsch)]."[17]  R.R. at 268a (emphasis added).

Sheehan investigated the subject events, interviewed staff, and reviewed supporting documents and the Commonwealth procurement policy before recommending Matthew's removal.  Sheehan verified that the work orders for which VitalChek sought payment were for DAVE enhancements not covered by the DELL contract, and that there were no purchase orders issued under the ITQ before VitalChek did the work specified therein.  *See* R.R. at 172a, 177a.  He further discovered that the ITQ's annual two $50,000.00 purchase order limit had already been met for fiscal year 2013-2014,[18] and that the subject work was not included under those purchase orders.[19]  *See* R.R. at 149a-151a, 174a; *see also* R.R. at 321a-444a (N.T. Ex AA-49); N.T. Exs. AA-46, AA-47, AA-48.  Sheehan also explained that although BIT installed the enhancements pursuant to the work orders, BIT did not review or process payments for them.  *See* R.R. at 146a, 166a, 175a-176a.

Sheehan articulated that his review of VitalChek and BHSR emails made clear that Matthew was aware that there was no contract to support the work she approved in the subject work orders.  In a June 11, 2014 email, Caruso notified VitalChek employees Karen Gary (Gary) and Stephen Berryman (Berryman) that, at Matthew's request, they were to submit forms for VitalChek to be paid by

---

[17] Matthew supervised both Romberger and Kirsch.  *See* R.R. at 131a-132a.  Baker also recommended discipline for Romberger and Kirsch as a result of errors that led to Matthew's removal.  *See* R.R. at 132a, 142a-143a.

[18] The new fiscal year 2014-2015 began July 1, 2014.  *See* R.R. at 174a.

[19] Sheehan discovered that VitalChek completed the work referenced in those purchase orders *before* the purchase orders were issued.  *See* R.R. at 149a-152a, 174a; *see also* N.T. Exs. AA-20, AA-46, AA-47 and AA-48.

The work order numbers referenced in the purchase orders did not include those VitalChek listed in its June 26, 2014 invoice approval request.

13

Commonwealth purchase card. *See* R.R. at 177a, 302a-303a (N.T. Ex. AA-34). Berryman responded that the Commonwealth "will need PA to submit a [purchase order] for the Work Orders that will be paid for." R.R. at 302a. Caruso informed Matthew:

> It looks like we can't do this without a [purchase order] being created.
>
> Based on my past experience, if a [purchase order] needs to be generated, then I have to go through BIT/[Chilcote] to make that happen?
>
> Maybe you know of another way, I don't know? In the meantime, I have reached out to [Sabol] to see if she knows how we can get this done independently of BIT. . . .

R.R. at 302a. **Matthew responded: "We can only do two [purchase orders] a year and we have reache[d] our max**." R.R. at 302a (emphasis added). Caruso stated: "I know and I'm working on your [two] fifty's [sic] for 2014 now, and those we know will have to go through BIT, so that would end up using your two for the year . . . unless we can find a way to pay on the credit card." R.R. at 302a. On June 12, 2014, Berryman emailed Caruso two invoice acceptance forms splitting a portion of VitalChek's balance so that it could be paid "within Pennsylvania's [c]redit [c]ard limitations." R.R. at 306a (N.T. Ex. AA-37). Sheehan clarified for the Commission that Commonwealth procurement policies prohibit splitting invoices in order to bypass the procurement process. *See* R.R. at 156a.

According to a June 17, 2014 email chain Sheehan discovered, Romberger requested that Sabol provide Commonwealth purchasing card details because "[Matthew] would like to pay [a few VitalChek work] orders by credit card," and Sabol informed Romberger: "We currently have $26.00 as a remaining balance on the . . . [p]urchasing card line item. Can this expenditure wait until the next [fiscal year]?" N.T. Ex. AA-40; *see also* R.R. at 159a. Romberger notified Matthew that

14

the purchasing card was not a payment option, and asked "where would you like to go from here?" N.T. Ex. AA-40. By June 27, 2014 email, Caruso verified to Kirsch, Pahwa and Romberger that "all of [the invoices in VitalCheks' June 26, 2014 approval form] can be paid" because the requested work had been completed.[20] R.R. at 160a; *see also* R.R. at 159a; N.T. Ex. AA-41. Sheehan substantiated that since Caruso was an outside, third-party contractor and not a Commonwealth employee, she "ha[d] no authority at all whatsoever to release a payment." R.R. at 160a.

Finally, in an August 1, 2014 email, Sheehan observed that Sirko summarized for Keating:

> The work orders in question were requested by [Matthew] and her staff (usually through [Caruso]). We developed the requirements, got them approved by the [BHSR] staff, and delivered them. After testing, **they were in turn signed off on by** [**Matthew**]. **We were asked to invoice PA after the new** [**statement of work**] **went into effect**, because it would include a mechanism to get us easily paid. This was not initially troublesome to us, since we believed the [statement of work] would be completed in July of 2013. However, as you know, **the date of the** [**statement of work**] **continued to slip**. Earlier this year, we **made a decision internally to send the request to invoice if it didn't appear the** [**statement of work**] **would be in effect by July**. After [Matthew] left, we decided to prepare and submit the request. [Gary] believes that [Berryman] reached out to [Caruso], advised her what we were going to do, and provided her with a copy so she could check her records to make sure it corresponded accurately with PA's records. We then formally submitted the request.

R.R. at 265a (N.T. Ex AA-3) (emphasis added). When Keating inquired "who specifically asked VitalChek to wait for the new [statement of work] to go into effect before sending the invoices[,]" Sirko responded: "**It was** [**Matthew**] **who asked us to**

---

[20] Contrary to Matthew's representation that "Caruso directed that the VitalChek invoices be paid" (Matthew Br. at 24), Caruso did not authorize payment, but rather justified that since the requested work had been completed, payment was due VitalChek.

15

**do that**." R.R. at 264a (emphasis added). Based upon his investigation, Sheehan recommended Matthew's removal for unsatisfactory work performance and policy violation and, with Baker's approval, conducted Matthew's pre-disciplinary conference. *See* R.R. at 161a.

> This Court has explained:

> In civil service cases, the Commission is the sole fact-finder. As such, determinations as to witness credibility and resolution of evidentiary conflicts are within the Commission's sole province, and we will not reweigh the evidence or substitute our judgment even though we might have reached a different factual conclusion. When reviewing a Commission decision, we view the evidence, and all reasonable inferences arising from the evidence, in a light most favorable to the prevailing party.

*Perry*, 38 A.3d at 948 (citations omitted). Accordingly, "[t]his Court . . . must accept [the Commission's] findings, if they are supported by substantial evidence. Substantial evidence needed to support a finding of the Commission is relevant evidence that a reasonable mind might accept as adequate to support the conclusion reached." *Daily v. State Civil Serv. Comm'n (Northampton Cnty. Area Agency on Aging)*, 30 A.3d 1235, 1239-40 (Pa. Cmwlth. 2011) (quoting *Naso v. State Civil Serv. Comm'n (Dep't of Corr.)*, 696 A.2d 923, 926 (Pa. Cmwlth. 1997) (citation omitted)).

> Here, the Commission concluded:

> Upon review of the record, the Commission finds that the [Department] has presented sufficient evidence to support the charges. We find Chilcote credible that BIT was involved in installation of the products, but not responsible for the procurement. We find Baker credible that [Matthew] had ample opportunities to inform her of any concerns about VitalChek's work and failed to take advantage of any of those times. We find Keating, Pahwa, and Sheehan credible that they obtained documents showing [Matthew's] procurement of services without a contract, that [Matthew] made an attempt to pay VitalChek work orders via Commonwealth credit cards, and that

16

[Matthew] tried to make payments without following the required protocol, and improperly authorized VitalChek to install software without a contract or any purchase orders issued. . . . [Matthew] knowingly authorized VitalChek to complete work when she knew there was neither a contract nor a purchasing order in place.

Commission Adj. at 22-23 (footnote omitted).

Substantial evidence supported the Commission's findings and conclusions that, although there were two methods under which VitalChek may have qualified for payment – the DELL contract and the ITQ – **neither contract covered the specific VitalChek services Matthew authorized in this case**. Matthew was aware that in order for VitalChek to be paid for the work she authorized in 2013 and 2014, a purchase order had to be issued by BIT pursuant to the ITQ, but the two $50,000.00 purchase order limit had already been met for the 2013-2014 fiscal year.[21] In order to avoid that process, without a purchase order, **Matthew instructed VitalChek to proceed with the work, but to wait until after the Proposed Contract was executed to bill the Commonwealth.** Although it is not evident whether the Proposed Contract was ever executed with VitalChek, **it is clear that the Proposed Contract was not in effect when Matthew ordered the subject work to be performed**. Accordingly, we hold that the Commission properly determined that Matthew authorized VitalChek to conduct work without a contract in violation of the Commonwealth's procurement policy.

Matthew further asserts that the Department failed to meet its burden of proving that Matthew was responsible for managing the VitalChek procurement while she was BHSR Director. Matthew specifically declares that the Commission

---

[21] Even assuming, *arguendo*, that Matthew had not ascertained that knowledge from the Commonwealth Procurement Code, 62 Pa.C.S. §§ 101-4604, the Commonwealth's Procurement Handbook, or her meetings with BIT and VitalChek, she was reminded of that requirement by Chilcote in June 2012 (N.T. AA-1) and February 2013 (N.T. Ex. AA-7), and by Caruso in June 2014 (*see* R.R. at 302a).

17

failed to make necessary findings of fact concerning Caruso's pivotal procurement role in the VitalChek initiative. We disagree.

We acknowledge that the Commission did not make specific findings relative to Caruso's role in the VitalChek procurement process. Nevertheless, it is undisputed that Caruso was under contract with BIT to be the VitalChek project manager, and that Caruso worked with Matthew on the *operation* side of the DAVE enhancement process (*i.e.*, translating and coordinating BHSR's needs with VitalChek's functionality, etc.) during the events that led to Matthew's removal. *See* R.R. at 31a, 127a-130a. That the Commission made no such findings does not render the Commission's Adjudication "fatally flawed," Matthew Br. at 25, nor change the fact that Matthew was ultimately responsible for approving the *procurement* of the DAVE enhancements while she was BHSR Director.

Despite Matthew's contention that she relied on Caruso to manage the VitalChek project, and that Matthew merely signed work orders as directed by Caruso, *see* Matthew Br. at 20-24, it is clear from the record that Matthew was well-informed about BHSR's technology needs, VitalChek, and the DAVE enhancements. She admitted that she participated with BHSR and Caruso in weekly meetings with VitalChek regarding the system and DAVE enhancements, and attended biweekly meetings with BIT to discuss VitalChek operations, necessary changes, DAVE enhancements, problems and work orders. *See* R.R. at 187a-188a, 192a. Matthew also confirmed that when DAVE enhancements were necessary, her staff created the work orders and Caruso would review them, but Matthew ultimately approved and signed them. *See* R.R. at 187a. In addition, Matthew reported regularly informing Baker about the improvements BHSR experienced due to the enhancements installed, and upcoming enhancements to be made. *See* R.R. at 122a, 124a, 137a, 188a.

The record is devoid of support for Matthew's assertion that since Caruso was the BHSR/BIT liaison, BIT knew about the VitalChek work orders and,

18

thus, should have maintained greater oversight of Matthew's actions.[22] *See* R.R. at 187a. Keating declared, and Chilcote verified, that Matthew and BHSR completely managed the DAVE enhancement process and "took ownership of paying . . . without involving [BIT]." R.R. at 48a. That fact is illustrated by the Work Order Process Tracking document for the subject enhancements, which did not include BIT therein, and was maintained in BHSR's password-protected network drive, accessible only to Matthew and her staff. *See* R.R. at 48a. Moreover, in the June 11, 2014 email exchange, Caruso informed Matthew that Matthew's plan to pay VitalChek without a purchase order or BIT's involvement would not work, and she sought Matthew's instruction on how to get VitalChek paid "independently of BIT." R.R. at 302a. Matthew – not Caruso or BIT – instructed VitalChek to work without a contract, and not to send invoices for that work until after a contract was put in place. Finally, and most importantly, Matthew affirmed Baker's representation that Caruso was prohibited from being involved with the Proposed Contract under which Matthew instructed VitalChek to provide the services at issue. *See* R.R. at 140a, 192a, 195a.

Based upon the evidence and testimony the Commission found credible, BIT was excluded from VitalChek's DAVE enhancement process, and Matthew directed Caruso's actions related thereto. There is no record evidence that Caruso could retain VitalChek's services without Matthew's approval and, by Matthew's own admission, Caruso could not participate in negotiations, let alone authorize funding for VitalChek or direct work under the Proposed Contract. Accordingly, there was substantial evidence to support the Commission's conclusions that Matthew

---

[22] We acknowledge Keating's testimony that, in September 2013, he began to consider replacing Caruso due to complaints regarding her general lack of communication with BIT. *See* R.R. at 57a, 130a. However, Caruso's purported inadequacies do not excuse Matthew's failures. To the contrary, armed with the knowledge of Caruso's shortcomings, Matthew should have taken even more care to ensure BIT's full involvement. Rather, Matthew expressed her displeasure about Caruso being replaced as project manager, and continued to exclude BIT. *See* R.R. at 57a, 130a.

was responsible for "manag[ing] the procurement process used by BHSR during her tenure as its Director," that she "knowingly authorized VitalChek to complete work when she knew there was neither a contract nor a purchasing order in place[,]" and that "BIT could not be responsible for making payments on invoices it never received or for work it did not know was being performed." Commission Adj. at 23. Under the circumstances, it was not necessary for the Commission to issue specific findings of fact concerning Caruso's role in the VitalChek procurement that led to Matthew's removal.

Matthew next contends that the Commission erred by failing to consider Matthew's 24-year work performance record. *See* Matthew Br. at 31. We disagree. Initially, we acknowledge that an employee's work history may be relevant to determining punishment levels. *See Pa. Dep't of Transp. v. State Civil Serv. Comm'n (Boccinfuso)*, 84 A.3d 779 (Pa. Cmwlth. 2014). We also recognize that Matthew's 2008-2009, 2009-2010 and 2012 evaluations reflect her previous exemplary work performance. *See* R.R. at 445a-450a (N.T. Ex. AP-1), 451a-457a (N.T. Ex. AP-2), 462a-464a (N.T. Ex. AP-5). However, "just cause for removal is largely a matter of discretion on the part of [Baker,] the head of the [D]epartment." *Szablowski*, 111 A.3d at 261 (quoting *Perry,* 38 A.3d at 951).

According to Sheehan, who recommended Matthew's removal to Baker:

Q. Did you take [Matthew's] prior employment history with the Department into account?

A. Yes. Yes, it was a very difficult decision. [Matthew] had a great record[.] . . . **She had a good work record, but, unfortunately, the size, scope, and duration of this lapse was too great to rehabilitate**, we felt, as an employer. The trust had been broken to the point where **we**, as the employer, **cannot trust** [**Matthew**] **to effectively manage independently** [**D**]**epartment programs** at this point because of this, so ---.

R.R. at 167a (emphasis added); *see also* R.R. at 180a. Baker, who ultimately approved Matthew's removal, explained:

> Q. In concluding that removal was the appropriate level of discharge, did you take [] [Matthew's] prior experience with the Commonwealth into consideration . . . ?
>
> A. **Yes, and it probably made it, at least for me, a more appropriate response of dismissal, because she had been here a long time; she knew the rules.** She had worked with contracts and grants, I mean, the rules. I mean, if she was an absolute newbie to the State Government, right or wrong, it might have given you pause, but I was always under the impression she knew the rules. So in that respect, you know them, you know them. And if you're not sure, when you've been with the State long enough, you know when to ask. You know when to go to someone saying can I do this or can I not do this. And so I did expect that level of understanding on her part.

R.R. at 136a (emphasis added).

Where, as here, both Baker and Sheehan expressly declared that they reviewed and considered Matthew's work history before concluding that removal was the appropriate discipline for her actions, and the Commission found Sheehan's and Baker's testimony credible, held that "the [Department] has properly supported its charges," Commission Adj. at 23, and concluded that "[t]he [Department] has presented evidence establishing just cause for [Matthew's] removal[,]" Commission Adj. at 24, we hold that the Commission considered Matthew's work performance record.

Matthew further argues that the Department erred by removing her from a civil service position due to her alleged failure to properly carry out procurement duties she had while in a non-civil service position. Rather than asserting that the law prohibits such action, Matthew specifically contends that the Department "set forth

21

**no** rationale as to how [her] alleged nonfeasance . . . as a non-civil service Director in BHSR rendered [her] unfit for her lower civil service position[.]" Matthew Br. at 28.

The law requires that just cause must be merit-related, and must rationally and logically touch upon Matthew's competency and ability. *Szablowski*; *Wei*. Thus, "to be sufficient, the cause should be personal to the employee and such as to render the employee unfit for his or her position, thus making dismissal justifiable and for the good of the service." *Pa. Bd. of Prob. & Parole v. State Civil Serv. Comm'n (Manson)*, 4 A.3d 1106, 1112 (Pa. Cmwlth. 2010). Accordingly, there is no legal prohibition against the Department removing a civil service employee based on incompetency demonstrated in a non-civil service job.

Here, the Commission credited testimony about the Commonwealth's and the Department's procurement procedures and policies, and Matthew's knowledge and violations thereof. Based on that record evidence, **Matthew knowingly approved at least 47 work orders over a span of six months for VitalChek to provide $557,252.00 in IT services to the Department without a contract in place under which VitalChek could be paid.** Even if we assume *arguendo* that Matthew was not aware that BIT had to issue a purchase order before VitalChek executed Matthew's work orders, and/or that Caruso was solely responsible for notifying BIT about the work orders, the record evidence is clear that Matthew: (1) was fully aware of VitalChek's ongoing DAVE enhancements; (2) approved the subject work orders; (3) intended for VitalChek to be paid for that work under the Proposed Contract (about which Caruso was deliberately not provided any information and had no oversight authority) and, thus, instructed VitalChek to wait to bill the Department after the Proposed Contract was in place; (4) knew the Proposed Contract was not effective when she approved the work and VitalChek completed it; and (5) attempted to pay VitalChek by alternate methods, in violation of established procedures.

Although Matthew's removal stemmed from her procurement-related errors as BHSR Director, we agree that the "size, scope and duration" of her performance failures in this instance related directly to her competency and ability to manage or supervise any Department business, *i.e.*, authorizing work contrary to policy, failing to properly oversee the process and intentionally seeking to avoid disclosure of her actions. R.R. at 167a. Moreover, rather than investigate and/or take responsibility for what she should have known as BHSR Director, or take ownership of what clearly were *her* actions, she attempted to excuse her behavior and even went so far as to blame Caruso and/or BIT for failing to stop her. Thus, the just cause for Matthew's removal was personal to Matthew.

Under the circumstances, the Commission properly found that Matthew failed to adequately manage her duties as BHSR Director and, since her "actions clearly reflect negatively upon her ability and competence to perform her job duties" as WIC Bureau Director, Commission Adj. at 23, her dismissal was "justifiable and for the good of the service." *Manson*, 4 A.3d at 1112. Accordingly, we hold that the Department did not err by removing Matthew from her civil service position based on her failure to properly carry out procurement duties she had while in a non-civil service position.

Matthew finally asserts that the Adjudication "evidences [the Commission's] arbitrary and capricious reasoning." Matthew Br. at 34. We disagree. Just cause for Matthew's removal was within the Department's discretion. *Szablowski*. "'To constitute an abuse of discretion, the [administrative agency] must have based its conclusion upon wholly arbitrary grounds, in capricious disregard of competent evidence.' *Lily Penn* [*Food Stores, Inc. v. Pa. Milk Mktg. Bd.*]*,* 472 A.2d [715,] 719 [(Pa. Cmwlth. 1984)]." *Unified Sportsmen of Pa. v. Pa. Game Comm'n*, 18 A.3d 373, 382 (Pa. Cmwlth. 2011).

> [Our Supreme Court has] defined a capricious disregard of the evidence to exist 'when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result.' *Arena v. Packaging Sys*[.] *Corp.,* . . . 507 A.2d 18, 20 ([Pa.] 1986); *see also Leon E. Wintermyer, Inc. v. Workers' Comp*[.] *Appeal B*[d.] *(Marlowe),* . . . 812 A.2d 478 ([Pa.] 2002). Furthermore, under the capricious disregard standard, an agency's determination is given great deference, and relief will rarely be warranted. *Wintermyer,* 812 A.2d at 484.

*Station Square Gaming L.P. v. Pa. Gaming Control Bd.*, 927 A.2d 232, 237-38 (Pa. 2007). "An appellate court conducting a review for capricious disregard of material, competent evidence [still] may not reweigh the evidence or make credibility determinations." *Wise v. Unemployment Comp. Bd. of Review*, 111 A.3d 1256, 1263 (Pa. Cmwlth. 2015). Accordingly, "[w]here substantial evidence supports the findings, and those findings in turn support the conclusions, it should remain a rare instance where an appellate court disturbs an adjudication based on capricious disregard." *Kiskadden v. Pa. Dep't of Envtl. Prot.*, 149 A.3d 380, 401 (Pa. Cmwlth. 2016). Moreover,

> the fact-finder 'is not required to address each and every allegation of a party in its findings, nor is it required to explain why certain testimony has been rejected.' *Balshy* [*v. Pa. State Police*], 988 A.2d [813,] 836 [(Pa. Cmwlth 2010)]. The pertinent inquiry is whether the [Commission's] findings are supported by substantial evidence. *Id.* 'The findings need only be sufficient to enable the Court to determine the questions and ensure the conclusions follow from the facts.' *Id.*

*Kiskadden*, 149 A.3d at 401.

In the instant matter, the Commission made extensive, detailed findings in its Adjudication supported by substantial record evidence that Matthew authorized VitalChek to perform work without a contract in violation of the Commonwealth/Department's procurement policy, and that her work performance

24

was unsatisfactory because she failed to adequately manage the BHSR's procurement activities. Accordingly, we hold that the Commission's Adjudication did not contain "arbitrary and capricious reasoning." Matthew Br. at 34. Rather, viewing the evidence and all reasonable inferences arising therefrom in a light most favorable to the Department, as we must, *Perry*, we hold that the Commission properly sustained Matthew's removal and dismissed her appeal.

Based on the foregoing, the Commission's Adjudication is affirmed.

_____
ANNE E. COVEY, Judge

Senior Judge Colins dissents.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Marina O. Matthew,                    :
                    Petitioner        :
                                      :
          v.                          :
                                      :
State Civil Service Commission        :
(Department of Health),               :     No. 1563 C.D. 2016
                    Respondent        :

## O R D E R

AND NOW, this 6th day of September, 2017, the State Civil Service Commission's August 23, 2016 Adjudication is affirmed.


_____
ANNE E. COVEY, Judge